**IN RE: Daniel Lee RITZ, Jr., Debtor.**

**Husky International Electronics, Inc., Plaintiff**

**v.**

**Daniel Lee Ritz, Jr., Defendant.**

Case No. 09–39895
Adversary No. 10–03156

United States Bankruptcy Court, S.D. Texas, Houston Division.

Signed 04/19/2017

---

Jeffrey Lee Dorrell, Hanszen Laporte, Houston, TX, for Plaintiff.

William David Weber, Weber Law Firm, Jeffrey S. Williams, JS Williams and Associates, Houston, TX, for Defendant.

**MEMORANDUM OPINION ON PLAINTIFF'S ORIGINAL COMPLAINT TO DENY DISCHARGEABILITY OF DEBT PURSUANT TO 11 U.S.C. § 523**

[Adv. Doc. No. 1]

Jeff Bohm, United States Bankruptcy Judge

## I. INTRODUCTION

Prosecution of complaints to determine dischargeability under 11 U.S.C.

§ 523(a)(2)(A)[1] are quite common in the bankruptcy system. However, prosecution of the complaint to determine dischargeability in the case at bar has been quite uncommon. In 2011, this Court, after holding a trial, issued a memorandum opinion explaining why it denied the plaintiff's request for a judgment of non-dischargeability. *In re Ritz*, 459 B.R. 623 (Bankr. S.D. Tex. 2011), *rev'd and remanded sub nom. Matter of Ritz*, 832 F.3d 560 (5th Cir. 2016). The plaintiff appealed, and in 2014, the District Court issued a memorandum opinion explaining its affirmance of this Court's ruling. *In re Ritz*, 513 B.R. 510 (S.D. Tex. 2014), *rev'd and remanded sub nom. Matter of Ritz*, 832 F.3d 560 (5th Cir. 2016). The plaintiff then appealed to the Fifth Circuit, and in 2015, that Court issued a memorandum opinion explaining its affirmance of the District Court's ruling. *In re Ritz*, 787 F.3d 312 (5th Cir. 2015), *rev'd and remanded sub nom. Husky Int'l. Elecs., Inc. v. Ritz*, — U.S. —, 136 S.Ct. 1581, 194 L.Ed.2d 655 (2016). Undeterred, the plaintiff sought relief from the Supreme Court, and in 2016, the highest court in the land issued an opinion that reversed the Fifth Circuit's ruling and remanded the matter for further proceedings consistent with its decision. *Husky Int'l. Elecs., Inc. v. Ritz*, — U.S. —, 136 S.Ct. 1581, 194 L.Ed.2d 655 (2016). On remand, the Fifth Circuit issued another memorandum opinion and, in doing so, remanded the matter to this Court for further findings of fact and conclusions of law. *Matter of Ritz*, 832 F.3d 560 (5th Cir. 2016). This Court now issues this Memorandum Opinion—the sixth one overall for this dispute—explaining why it has now decided to grant the plaintiff's request for a judgment of non-dischargeability.

## II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY OF THIS ADVERSARY PROCEEDING

Husky International Electronics, Inc. ("Husky") is a supplier of components used in electronic devices. Between 2003 and 2007, Husky sold its products to Chrysalis Manufacturing Corp. ("Chrysalis"), and Chrysalis accumulated a debt to Husky totaling $163,999.38. [Pl's Ex. No. 3, p. 25 of 25[2]]. During this 4–year period, Daniel Lee Ritz, Jr. (the "Debtor") served as a director of Chrysalis and owned at least 30% of the company's stock. [Feb. 2, 2011 Tr. 68:13–69:2, 78:17–22].

Between 2006 and 2007, the Debtor orchestrated transfers of cash out of Chrysalis's accounts into the accounts of several other entities in which the Debtor had an interest. [Pl's Ex. No. 5]. Meanwhile, Chrysalis did not pay the debt of $163,999.38 it owed to Husky (the "$163,999.38 Debt"). Indeed, Chrysalis filed a Chapter 7 petition in 2008. [Case No. 08–33793, Doc. No. 1]; [Def's Ex. No. 56[3]].

---

1. Hereinafter, any reference to any section (i.e., §), unless otherwise noted, refers to a section in 11 U.S.C., which is the United States Bankruptcy Code, and any reference to "the Code" refers to the United States Bankruptcy Code. Further, any reference to a "Rule" is a reference to the Federal Rules of Bankruptcy Procedure.

2. Husky's exhibits (i.e., "Pl's Ex.") were admitted throughout the trial. Specifically, Husky's exhibit numbers 1 through 4, 6, 7, and 167 through 169 were admitted on February 2, 2011. Husky's exhibit numbers 171,

172, 174, and 175 were admitted on February 3, 2011. Finally, Husky's exhibit number 5 was admitted on February 10, 2011.

3. The Debtor's exhibits (i.e., "Def's Ex.") were admitted throughout the trial. Specifically, the Debtor's exhibits 38, 39, 42, 43, 55a, and 69 were admitted on February 10, 2011. The Debtor's exhibits 1 through 11, 25.1 through 32.4, 45 through 49, 56, 57, 59.1, 59.2, 60, 61.1 through 61.3, 62.1 through 64.18, 65, 66, 67, and 68 through 68.18 were admitted on February 11, 2011.

Following Chrysalis's lead, the Debtor filed his own Chapter 7 petition in this Court in 2009. [Main Case No. 09–39895, Doc. No. 1]. Husky thereafter timely filed a complaint to determine dischargeability against the Debtor, seeking a judgment that the $163,999.38 Debt is a personal obligation of the Debtor that is non-dischargeable under § 523(a)(2)(A) (the "Adversary Proceeding").[4] [Adv. Doc. No. 1]. Husky based its § 523(a)(2)(A) claim on § 21.223(b) of the Texas Business Organization Code[5] (the "TBOC"). [Id. at p. 6, ¶ 13]. This section allows a creditor of a corporation to pierce the corporate veil and impose liability on an officer, director, or shareholder of the company if the creditor can prove that the individual "caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the holder, beneficial owner, subscriber, or affiliate." Tex. Bus. Org. Code Ann. § 21.223(b) (WestlawNext 2015). This Court held a trial and, on August 4, 2011, issued a memorandum opinion explaining why Husky could not prevail under its § 523(a)(2)(A) claim. *See Ritz*, 459 B.R. 623.

Specifically, this Court explained that the "actual fraud" element of § 21.223(b) requires that the defendant make a representation to the plaintiff; and since the Debtor made no representation to Husky, no actual fraud could be proven—which in turn meant that Chrysalis's corporate veil could not be pierced to allow Husky to impose personal liability on the Debtor for the $163,999.38 Debt. *Id.* at 633. Additionally, this Court held that the test for proving "actual fraud" under § 21.223 was the same for proving "actual fraud" under § 523(a)(2)(A): namely, proof of a representation by the defendant to the plaintiff; and since the Debtor made no representation to Husky, there was no way that this Court could hold that the $163,999.38 Debt was a non-dischargeable personal obligation of the Debtor. *Id.*

Husky appealed to the District Court. [Adv. Doc. No. 97]. On July 14, 2014, the District Court issued a memorandum opinion affirming this Court's ruling. *Ritz*, 513 B.R. 510. However, in doing so, the District Court disagreed with this Court's view that the "actual fraud" element of § 21.223 requires a misrepresentation by the Debtor to Husky. *Id.* at 537. Citing a Fifth Circuit opinion on § 21.223 issued two years after this Court's original 2011 opinion—*Spring Street Partners–IV L.P. v. Lam*, 730 F.3d 427 (5th Cir. 2013)—the District Court held that the "actual fraud" element of § 21.223 does not require any representation.[6] *Ritz*, 513 B.R. at 537. Rather, the District Court held that actual fraud under § 21.223 can be established by proving that the defendant (here, the Debtor) committed "actual fraud" under Texas Business and Commerce Code § 24.005.[7] *Id.* at 537–38. In the context of

**4.** The Complaint also sought, in the alternative, a judgment of non-dischargeability based upon 11 U.S.C. § 523(a)(4) and § 523(a)(6). This Court disposed of these claims in the Debtor's favor; these rulings were upheld upon appeal; and the only claim now still at issue is Husky's § 523(a)(2)(A) claim.

**5.** Hereinafter, any reference to § 21.223(b) refers to this specific section of the TBOC.

**6.** In finding that the "actual fraud" element of § 21.223(b) does not require a representa-

tion by the defendant, the District Court also cited a Texas appellate court opinion issued in 2012: *Tryco Enters., Inc. v. Robinson*, 390 S.W.3d 497, 508, 510 (Tex. App.–Houston [1st Dist.] 2012, pet. dism'd)..

**7.** This section of the Texas Business and Commerce Code is often referred to as "TUFTA," i.e., the Texas Uniform Fraudulent Transfer Act, and will frequently be referred to as such herein. Hereinafter, any reference to "§ 24.005" refers to this specific section of TUFTA.

this suit, the District Court held that the transfers of funds effectuated by the Debtor out of Chrysalis's account could constitute "actual fraud" if Husky could prove the existence of a sufficient number of so-called "badges of fraud." *Id.* at 538. The District Court then held that this Court, in its memorandum opinion, had found the existence of four badges of fraud. *Id.* Based on the presence of these badges of fraud, the District Court held that the Debtor had committed actual fraud under TUFTA and therefore had established the "actual fraud" component required by § 21.223. *Id.*

Despite this holding, the District Court affirmed this Court's ruling that Husky could not prevail because the District Court agreed with this Court that "actual fraud" under § 523(a)(2)(A)—unlike "actual fraud" under § 21.223—does require a misrepresentation from the defendant (here, the Debtor) to the plaintiff (here, Husky); and the District Court emphasized that the Debtor never made any representation to Husky. *Id.*

Husky appealed to the Fifth Circuit. [Adv. Doc. No. 115]. On May 22, 2015, the Fifth Circuit issued a memorandum opinion affirming the District Court's ruling. *Ritz*, 787 F.3d 312. In doing so, the Fifth Circuit did not address the District Court's holding about the ability to establish "actual fraud" under § 21.223 through badges of fraud and without a representation. Rather, the Fifth Circuit focused solely on the District Court's affirmance of this Court's ruling that "actual fraud" under § 523(a)(2)(A) requires a representation by the defendant and that Husky could not prevail because the Debtor made no representation. *Id.* at 316–17. Much of the Fifth Circuit's opinion was spent explaining why it disagreed with the Seventh Circuit's holding in *McClellan v. Cantrell*, 217 F.3d 890 (7th Cir. 2000), that "actual fraud"

under § 523(a)(2)(A) does not require a representation. *Id.* at 317–19. By the end of its discussion, the Fifth Circuit slammed the door shut on Husky's § 523(a)(2)(A) claim:

> For all of these reasons, we conclude that a representation is a necessary prerequisite for a showing of "actual fraud" under Section 523(a)(2)(A). Because the parties agree that the record contains no evidence of such a representation [by the Debtor to Husky], discharge of the debt at issue is not barred under this provision.

*Id.* at 321.

Husky thereafter filed a writ of certiorari with the Supreme Court. [Adv. Doc. No. 115]. Noting that there is a split among the circuit courts over whether "actual fraud" under § 523(a)(2)(A) requires a representation from the debtor "or whether it encompasses other traditional forms of fraud that can be accomplished without a false representation, such as a fraudulent conveyance of property made to evade payment to creditors," the Supreme Court granted certiorari to resolve the split. *Ritz*, 136 S.Ct. at 1585. On May 16, 2016, the Supreme Court issued an opinion that reversed the Fifth Circuit's judgment and remanded the matter for further proceedings consistent with the opinion. *Id.* The Supreme Court reviewed the history of the phrase "actual fraud" and concluded that no misrepresentation is required to successfully object to the discharge of a specific debt under § 523(a)(2)(A):

> Because we must give the phrase "actual fraud" in § 523(a)(2)(A) the meaning it has long held, we interpret "actual fraud" to encompass fraudulent conveyance schemes, even when those schemes do not involve a false representation. We therefore reverse the judgment of the Fifth Circuit and remand the case for

further proceedings consistent with this opinion.

*Id.* at 1590.

In the wake of the Supreme Court's decision, on August 10, 2016, the Fifth Circuit issued a memorandum opinion explaining what further steps need to be taken that are consistent with the Supreme Court's ruling. *Matter of Ritz*, 832 F.3d 560.

The Fifth Circuit began with this observation: "While the [Supreme] Court clarified the meaning of actual fraud in § 523(a)(2)(A), it did *not* specifically hold that actual fraud had occurred here or determine whether Husky could ultimately prevail in its attempt to deny [the Debtor] a discharge of the relevant debt. Rather, following its holding as to actual fraud, [the Supreme Court] 'remand[ed] the case for further proceedings consistent with [its] opinion.'" *Matter of Ritz*, 832 F.3d at 565 (emphasis in original (citations omitted). Given this instruction from the Supreme Court, the Fifth Circuit then stated:

> The Supreme Court instructed this court to address specific issues with respect to § 523(a)(2)(A) on remand. Accordingly, we now specifically address the issue pretermitted in our ill-fated opinion: whether Ritz is liable to Husky under Texas state law. Ritz's liability to Husky under Texas law is a threshold question with respect to whether Ritz may be denied a discharge under § 523(a)(2)(A) because, if Ritz is not liable under Texas law, then he owes no debt to Husky. Because, as we explain below, we cannot resolve the state law

issue without further fact finding by the bankruptcy court, we do not address the denial of a discharge under § 523(a)(2)(A) here and leave this determination to be made in the first instance by the bankruptcy court, after the necessary fact finding, in light of the standard articulated by the Supreme Court.

To succeed in denying Ritz a discharge under § 523(a)(2)(A), Husky must first show that Ritz is liable for the debt owed by Chrysalis to Husky. To show that Ritz is liable for the debt, Husky relies on Texas Business Organizations Code §. 21.223(b), which allows a plaintiff to pierce the corporate veil and hold a shareholder, such as Ritz, liable for the debts of a corporation. The district court held that Husky could pierce the corporate veil to hold Ritz liable. In our previous opinion, we did not address whether Ritz could be held liable for Chrysalis's debt to Husky under Texas's veil-piercing statute, but we do so here. We hold that the district court erred in concluding that Ritz was liable to Husky under the Texas veil-piercing statute because, in so concluding, it relied on a fact finding that the bankruptcy court did not actually make. However, we agree with the district court that Husky's theory that Ritz is liable for the debt owed by Chrysalis to Husky under Texas law is legally viable and therefore remand for further factual findings on this theory.

*Matter of Ritz*, 832 F.3d at 565–66. In remanding the matter to this Court,[8] the Fifth Circuit made it eminently clear that:

---

8. The language from the remand opinion is as follows: "Accordingly, we must remand this case to the district court (and thence to the bankruptcy court) for additional fact finding as to whether Ritz's conduct satisfies the actual fraud prong of TUFTA. This is so because, under Texas law, " '[i]ntent is a fact question uniquely within the realm of the trier of fact.'" *Matter of Ritz*, 832 F.3d at 569. After the Fifth Circuit issued its remand opinion, the District Court did, in fact, issue an order remanding the matter to this Court. [Civ. Case No. 4:11–CV–03020, Doc. No. 29].

[E]stablishing that a transfer is fraudulent under the actual fraud prong of TUFTA is sufficient to satisfy the actual fraud requirement of veil-piercing because a transfer that is made with the actual intent to hinder, delay, or defraud any creditor, necessarily involves dishonesty of purpose or intent to deceive. Given this holding, if Husky can show that Ritz's transfers in this case satisfy the actual fraud prong of TUFTA, then it can also show that Ritz's conduct constitutes actual fraud for the purposes of veil-piercing. As direct evidence of actual fraud is often scarce, TUFTA supplies a non-exclusive list of eleven factors, commonly known as badges of fraud, that courts may consider in determining whether a debtor actually intended to defraud creditors under TUFTA.

*Id.* at 567 (internal quotation marks and footnote omitted).

Having set forth that a "badge of fraud" analysis is appropriate for proving "actual fraud," the Fifth Circuit stated that:

If the bankruptcy court concludes on remand that Ritz's conduct satisfies the actual fraud prong of TUFTA and that the actual fraud was for Ritz's "direct personal benefit," Ritz is liable for Chrysalis's debt to Husky under Texas's veil-piercing statute and the bankruptcy court must then address whether Ritz should be denied a discharge under 11 U.S.C. § 523(a)(2)(A), consistent with the Supreme Court's opinion in this case. If, however, the bankruptcy court concludes that Ritz's conduct does not amount to actual fraud under Texas state law, then there is no debt to discharge, and the question of deniability under § 523(a)(2)(A) becomes moot.

*Id.* at 569.

Thus, it is now incumbent on this Court to undertake, at most, a three-step analysis. The first two steps are required by § 21.223 for determining whether Husky can pierce Chrysalis's corporate veil to impose personal liability on the Debtor for the $163,999.38 Debt. These two steps are as follows: (1) Are there sufficient badges of fraud for this Court to find that the Debtor committed "actual fraud"?; and (2) If so, was the Debtor's "actual fraud" for his direct personal benefit? If, after undertaking these steps, the Court concludes that the Debtor committed actual fraud for his direct personal benefit, then under § 21.223, the Debtor becomes personally liable to Husky for the $163,999.38 Debt. The third step then requires the Court to determine if the Debtor's personal liability for the $163,999.38 Debt is a non-dischargeable obligation under § 523(a)(2)(A). Stated differently, just because Husky is able to pierce Chrysalis's corporate veil to impose personal liability on the Debtor for the $163,999.38 Debt, it does not automatically follow that the $163,999.38 Debt is a non-dischargeable obligation. This Court must still inquire whether the Debtor's personal obligation for the $163,999.38 Debt is—to use the language of § 523(a)(2)(A)—a "debt for money [or] property to the extent obtained by ... actual fraud."

After receiving these instructions from the Fifth Circuit, this Court, on October 7, 2016, held a status conference with counsel for Husky and counsel for the Debtor. [Adv. Doc. Nos. 117, 119, & 124]. The Court inquired whether the parties wanted this Court to reopen the record so that they could introduce additional evidence. Both attorneys responded that they did not want to do so; rather, they wanted to make oral arguments based upon the existing record and submit additional briefing. [Tape Recording, Oct. 7, 2016 Hr'g at 1:34:56–1:36:40 P.M.; 1:40:39–1:41:22 P.M.]. Accordingly, the Court gave the parties approximately sixty days to prepare for oral arguments and to submit

briefs. [*Id.* at 1:47:01–1:49:00 P.M.]. On December 2, 2016, Husky and the Debtor each filed their respective briefs. [Adv. Doc. Nos. 120 & 121]. On December 16, 2016, the Court held a hearing and listened to oral arguments of counsel based upon the evidence introduced at the trial held in 2011 and the legal principles articulated by the Supreme Court and the Fifth Circuit thereafter. [Tape Recording, Dec. 16, 2016 Hearing at 1:50:28–1:51:20 P.M.]. The Court then continued the hearing until February 3, 2017 to allow the parties to submit additional briefs while the Court reflected upon the arguments made and the exhibits cited in support thereof. [*Id.* at 2:59:30–3:01:59 P.M.]. On January 26, 2017, the Debtor filed another brief, [Adv. Doc. No. 128], and Husky filed an additional brief on January 27, 2017, [Adv. Doc. No. 129]. On February 3, 2017, further arguments were made and then the Court took the matter under advisement. [Feb. 3, 2017 Tr. 5:24–6:9]

The Court now makes the following Findings of Fact and Conclusions of Law pursuant to Rules 7052 and 9014. To the extent that any Finding of Fact is construed to be a Conclusion of Law, it is adopted as such; and to the extent that any Conclusion of Law is construed to be a Finding of Fact, it is adopted as such. Further, this Court reserves the right to make additional findings and conclusions as it deems necessary.

### III. FINDINGS OF FACT [9]

**A. History of Chrysalis Manufacturing Corporation**

1. In 2002, the Debtor formed Chrysalis. Chrysalis was in the business of manufacturing components of products for various companies that, once the products were fully assembled, distributed them in the marketplace. [Feb. 10, 2011 Tr. 58:12–14]; [Adv. Doc. No. 94, Feb. 11, 2011 Tr. 67:5–10, 67:23–68:2]. The Debtor held and continues to hold a 30% interest in Chrysalis stock. [Adv. Doc. No. 94, Feb. 11, 2011 Tr. 68:13–69:2]; [Finding of Fact No. 4 in the 2011 Opinion]; [Adv. Doc. No. 1, pp. 2–3, ¶ 6]; [Adv. Doc. No. 8, p. 2, ¶ 6]. At all relevant times, the Debtor was in financial control of Chrysalis. [Adv. Doc. No. 94, Feb. 11, 2011 Tr. 101:18–19]; [Def's Ex. Nos. 63.1–64.18].

2. In 2003, through Chrysalis, the Debtor acquired a company called Link World, which was operated as Altatron EMC ("Altatron"). [Adv. Doc. No. 94, Feb. 11, 2011 Tr. 66:10–24]. Chrysalis then became known as "Chrysalis Altatron." [*Id.* at 15:16–18]. It is undisputed that references to "Altatron" refer to the entity known as "Chrysalis." [*Id.*]; [Feb. 2, 2011 Tr. 12:8–10].

3. The Debtor also testified that "Chrysalis needed capital the entire time that I [i.e., the Debtor] was involved with it." [Adv. Doc. No. 94, Feb. 11, 2011 Tr. 70:22–23]. Indeed, at all relevant times, Chrysalis was unable to pay its debts as they became due. [Finding of Fact No. 5 in the 2011 Opinion]; [Feb. 3, 2011 Tr.

---

9. In this Court's memorandum opinion of August 4, 2011, this Court made a total of sixteen findings of fact. *Ritz,* 459 B.R. at 627–28. All of these sixteen findings of fact are incorporated in the memorandum opinion that this Court is now issuing, and this Court cites to these particular findings by denoting them as "Finding of Fact No. ___ in the 2011 Opinion." Because the Fifth Circuit's 2016 memorandum opinion remands the matter to this Court for additional findings, this Court has also made further findings of fact, and they (together with the original findings) are set forth in this section III.

12:13–13:13]; [Pl's Ex. No. 171]. Moreover, at all relevant times, the sum of Chrysalis's debts was greater than all of Chrysalis's assets at a fair valuation. [Finding of Fact No. 6 in the 2011 Opinion]. Further evidence of Chrysalis's constant woeful financial condition is as follows:

a. The Debtor testified that "the company's [i.e., Chrysalis's] assets were less than what was owed." [Adv. Doc. No. 94, Feb. 11, 2011 Tr. 91:22–92:4]. He gave further testimony that he was not aware of any time when the assets were greater than the liabilities. [Id. at 92:11–16].

b. Chrysalis was unable to make payroll, so the Debtor would use his wholly-owned company, Institutional Insurance Management, to make cash infusions as necessary. [Def's Ex. Nos. 26.1 & 26.2]; [Adv. Doc. No. 94, Feb. 11, 2011 Tr. 39:1–7; 121:6–24]. In total, the Debtor estimates that, using this particular entity, he infused capital of approximately $2.4 million into Chrysalis in 2005 and 2006, with roughly $2.3 million of these funds being infused in 2005. [Pl's Ex. No. 169]; [Feb. 3, 2011 Tr. 45:20–24].

c. As of March 31, 2006, Chrysalis had assets of approximately $2.4 million and liabilities of about $5.6 million. [Adv. Doc. No. 94, Feb. 11, 2011 Tr. 72:6–21]. Thus, at this time, Chrysalis had a net negative equity of $3.2 million. [Id.].

d. As of April 21, 2006, Chrysalis had accounts payable of $640,031.54 that were more than 90 days past due. [Pl's Ex. No. 171, p. 3 of 3]. Around April or May 2007, EmlinQ purchased Chrysalis's assets for $600,000.00, [Feb. 10, 2011 Tr. 94:3–7]—a number lower than Chrysalis's accounts payable. [Feb. 3, 2011 Tr. 89:20–90:1]; [Def's Ex. Nos. 45–48]; [Pl's Ex. No. 171].

e. On July 7, 2006, Chrysalis executed a UCC Financing Statement with Virtra Manufacturing Corporation as the secured party. [Def's Ex. No. 1]. The Debtor testified that this was necessary so Chrysalis could receive some "intercompany advances" of half a million dollars. [Adv. Doc. No. 94, Feb. 11, 2011 Tr. 82:11—13]. Stated differently, for Chrysalis to obtain financing from Virtra Manufacturing Corporation, the loan had to be secured with assets of Chrysalis. The UCC Financing Statement reflects that VirTra Manufacturing Corporation perfected its lien on virtually all of Chrysalis's assets, including, but not limited to, accounts of Chrysalis. [Def's Ex. No. 1].[10]

f. As of March 2007, Chrysalis had assets valued at $2.1 million and liabilities of $7.68 million. [Adv. Doc. No. 94, Feb. 11, 2011 Tr. 72:22–73:13]. Thus, at this time, Chrysalis had a negative net equity of $5.36 million. [Id.].

10. While the UCC Financing Agreement was introduced into evidence, there was no security agreement put into the record evidencing that Chrysalis expressly gave a security interest in its assets to Virtra Manufacturing Corporation. Nevertheless, based upon the testimony adduced at the trial, it is clear to this Court that the Debtor believes that Chrysalis gave a lien to Virtra Manufacturing Corporation when it received "intercompany advances" from this entity.

g. The Debtor personally guaranteed $177,000.00 of debt owed by Chrysalis to Arrow Electronics, Inc. [Def's Ex. No. 43]. The Debtor never personally guaranteed any debt that Chrysalis owed to Husky.

h. The Debtor testified that Chrysalis was never able to pay its bills at any point in time. [Adv. Doc. No. 94, Feb. 11, 2011 Tr. 71:8–10].

4. On June 12, 2008, Chrysalis filed a voluntary Chapter 7 bankruptcy petition in the Southern District of Texas.[11] [Case No. 08–33793, Doc. No. 1]; [Def's Ex. No. 56]. The Debtor signed Chrysalis's petition as "Daniel L. Ritz, Jr., Director." [Case No. 08–33793, Doc. No. 1, p. 7 of 7]. In the statement of financial affairs ("SOFA"), section 10, entitled "other transfers," the Debtor, in his capacity as director of Chrysalis, represented that Chrysalis had not transferred any of its property outside the ordinary course of its business within two years preceding the filing of its bankruptcy petition. [Case No. 08–33793, Doc. No. 3, p. 47 of 54].[12] This representation was false, as Chrysalis (through the Debtor's actions), within two years of the filing of its bankruptcy petition, transferred a total amount of $1,161,279.90 out of Chrysalis's account into the accounts of entities that the Debtor controlled. [See infra Findings of Fact Nos. 23–29]. Further, in Schedule B, which describes the non-real estate assets of a debtor, the Debtor, in his capacity as the director of Chrysalis, represented that Chrysalis had no claims of any kind when, in fact, Chrysalis had a claim against the Debtor for the $1,161,279.90 of funds that the Debtor transferred out of Chrysalis's account into the accounts of entities which the Debtor controlled.

5. In Chrysalis's Schedule F (entitled "Creditors Holding Unsecured Nonpriority Claims"), the Debtor, in his capacity as director of Chrysalis, represented that Chrysalis had the following non-insider unsecured debts as of the date of the filing of its Chapter 7 petition:

a. Ninety debts under $5,000.00, [Case No. 08–33793, Doc. No. 3, pp. 10–40 of 54];

b. Twelve debts more than $5,000.00 but less than $10,000.00, [id.];

c. Twenty-four debts between $10,000.00 and $50,000.00, [id.];

d. Six debts more than $50,000.00 but less than $150,000, [id.];

e. Two debts more than $150,000.00, specifically: (1) $162,487.65 to Husky, [id. at p. 22 of 54] and (2)

11. Despite the parties' failure to introduce Chrysalis's schedules and statement of financial affairs into evidence, the Debtor did introduce into evidence the docket sheet for the Chrysalis case, and this Court has the right to take judicial notice of pleadings filed in the Southern District of Texas. *SEC v. First Fin. Grp. of Tex.*, 645 F.2d 429, 433 (5th Cir. 1981); *In re Arhens*, 120 B.R. 852, 854 (Bankr. S.D. Tex. 1990) (holding that "a court may take judicial notice of its own records."). After this Court heard post-remand arguments from counsel for Husky and the Debtor, this Court reviewed Chrysalis's schedules and statement of financial affairs, and in now issuing its ruling, the Court refers to certain information contained in these documents.

12. Item 10 of the statement of financial affairs reads as follows: "List all other property, other than property transferred in the ordinary course of the business or financial affairs of the debtor, transferred either absolutely or as security within two years immediately preceding the commencement of this case." [Case No. 08–33793, Doc. No. 3, p. 47 of 54].

$228,000.00 to Arrow Electronics, [*id.* at p. 13 of 54]. In its Schedule F, Chrysalis, through the Debtor as its director, represented that Chrysalis did not dispute the debt that it owed to Husky.

## B. History of the Relationship Between Husky and Chrysalis/the Debtor

6. On December 17, 2003, Altatron EMS (i.e., Chrysalis, [*see* Finding of Fact No. 2 *supra*]) entered into a Master Credit and Sales Agreement with Husky. [Pl's Ex. No. 1]. From 2003 to 2007, Husky sold and delivered electronic components to Chrysalis pursuant to this contract. [Finding of Fact No. 2 in the 2011 Opinion]; [Pl's Ex. Nos. 1, 2, & 3]. Further, this agreement included language requiring Chrysalis to pay Husky's attorneys' fees under the following circumstances: "If Seller [i.e., Husky] engages legal counsel to enforce Seller's rights under this Master Credit and Sales Agreement, Buyer [i.e., Chrysalis] shall pay Seller's reasonable attorneys [sic] fees and costs incurred by Seller in connection with such efforts, whether or not litigation is commenced." [Pl's. Ex. No. 1, p. 2, ¶ 13].

7. Chrysalis failed to pay for goods sold and delivered to Chrysalis by Husky in the amount of $163,999.38. [Finding of Fact No. 3 in the 2011 Opinion]; [Pl's Ex. No. 3, p. 25 of 25]; [Feb. 2, 2011 Tr. 35:1–7]. From October 2006 to January 2007, Husky accrued approximately ninety unpaid Chrysalis invoices. [Pl's Ex. No. 7].

8. On or around January 9, 2007, Husky became aware that checks received from Chrysalis totaling approximately $90,000.00 had not cleared. [Pl's Ex. No. 4]; [Feb. 2, 2011 Tr. 24:1–17].

9. On or around January 12, 2007, i.e., after certain checks from Chrysalis bounced, Nick Davis ("Davis"), the President and CEO of Husky, spoke with the Debtor by telephone. [Feb. 2, 2011 Tr. 26:17–28:10]. Davis credibly testified that he told the Debtor that if money was not immediately wired to pay for the products that Husky had delivered to Chrysalis, then Husky "would have to pursue litigation." [*Id.* at 26:17–28:6]. Davis did not specify if Husky would pursue litigation against Chrysalis or the Debtor personally.

10. On June 1, 2007, Chrysalis prepared an A/P [Accounts Payable] Aging Summary indicating that it owed $162,487.65 to Husky among other creditors. [Pl's Ex. No. 6, p. 2].

11. At some point in 2007, Husky filed suit against Chrysalis in the 280th District Court of Harris County, Texas styled, *Husky International Electronics, Inc. v. Chrysalis Manufacturing Corporation*, Cause No. 2007–39059. [Case No. 09–39895, Doc. No. 1, p. 32 of 54]; [Pl's Ex. No. 169, p. 3]. Depositions were taken on March 27, 2008. [Pl's Ex. No. 169].

12. On May 20, 2009, Husky filed suit against the Debtor, in its individual capacity, in the Southern District of Texas styled *Husky International Electronics, Inc. v. Ritz.* [Civ. Case No. 4:09–cv–01532, Doc. No. 1].

13. On December 31, 2009, the Debtor filed his Chapter 7 petition in this Court. [Main Case No. 09–39895, Doc. No. 1]. On June 4, 2010, the Debtor received a discharge under

§ 727. [Main Case No. 09–39898, Doc. No. 32].[13]

14. In his Schedule F (entitled "Creditors Holding Unsecured Non–Priority Claims"), the Debtor did not schedule either Chrysalis or the trustee of Chrysalis's Chapter 7 estate as a creditor holding a claim against the Debtor for the amount of the funds that the Debtor transferred out of Chrysalis's account into the several entities that he controlled. [*See infra* Findings of Fact Nos. 15–23]; [Main Case No. 09–39895, Doc. No. 8–1].

**C. History of the Debtor's Transfers from Chrysalis to Other Companies that he Controlled**

15. Between November 2006 and May 2007,[14] the Debtor caused $677,622.00 of Chrysalis's funds to be transferred to ComCon Manufacturing Services, Inc., a/k/a VirTra Merger Corporation ("ComCon"), without Chrysalis receiving reasonably equivalent value for the transfer.[15] [Finding of Fact No. 7 in the 2011 Opinion]; [Pl's Ex. No. 5]. Additionally, on September 19, 2006, the Debtor personally guaranteed a $1.0 million financing facility extended to ComCon by a financing company named Charter Capital. [Pl's Ex. No. 168, p. 3 of 5];

[Feb. 3, 2011 Tr. 64:12–20]. At trial, under cross-examination, the Debtor admitted that "it would be a good idea then to do anything [he] could to make sure the corporation pays that debt." [Feb. 3, 2011 Tr. 65:19–21]. The Debtor further admitted that the transfers of $677,622.00 from Chrysalis's account to ComCon's account would be a personal benefit to him because it would enable ComCon to pay the loan that the Debtor had personally guaranteed. [*Id.* at 66:4–8].

16. Between November 2006 and May 2007, the Debtor caused $121,831.00 of Chrysalis's funds to be transferred to CapNet Securities Corporation, without Chrysalis receiving reasonably equivalent value for the transfer. [Finding of Fact No. 8 in the 2011 Opinion]; [Pl's Ex. No. 5]. Indeed, in the Joint Pretrial Statement, the Debtor admits that he caused this transfer. [Adv. Doc. No. 61, p. 5 of 11].

17. Between November 2006 and May 2007, the Debtor caused $52,600.00 of Chrysalis's funds to be transferred to CapNet Risk Management, Inc., without Chrysalis receiving reasonably equivalent value for the transfer. [Finding of Fact

---

13. The order discharging the Debtor expressly set forth that certain debts are not discharged, including the following: "Debts that the bankruptcy court specifically has decided or will decide in this bankruptcy case are not discharged" as well as "Some debts which were not properly listed by the debtor." [Main Case No. 09–39895, Doc. No. 32, p. 2 of 2].

14. The Court focuses on this seven-month period because this is the relevant period when Chrysalis's checks to Husky that bounced were being written. [Feb. 2, 2011 Tr. 11:8–12].

15. Previously, the Debtor had given sworn answers to interrogatories that he did not initiate the transfers, but that the transfers were initiated by Marlin Williford, who was chief financial officer for ComCon and Chrysalis. [Finding of Fact No. 32]. However, at trial, the Debtor testified that his answers to these interrogatories were incorrect and that it was in fact he who made the transfers, not Mr. Williford. [Feb. 3, 2011 Tr. 33:16–21].

No. 9 in the 2011 Opinion]; [Pl's Ex. No. 5].

18. Between November 2006 and May 2007, the Debtor caused $172,100.00 of Chrysalis's funds to be transferred to Institutional Capital Management, Inc., and Institutional Insurance Management, Inc., without Chrysalis receiving reasonably equivalent value for the transfer. [Finding of Fact No. 10 in the 2011 Opinion]; [Pl's Ex. No. 5]. Indeed, in the Joint Pretrial Statement, the Debtor admits that he caused this transfer. [Adv. Doc. No. 61, p. 5 of 11].

19. Between November 2006 and May 2007, the Debtor caused $99,386.90 of Chrysalis's funds to be transferred to Dynalyst Manufacturing Corporation, without Chrysalis receiving reasonably equivalent value for the transfer. [Finding of Fact No. 11 in the 2011 Opinion]; [Pl's Ex. No. 5].

20. Between November 2006 and May 2007, the Debtor caused $26,500.00 of Chrysalis's funds to be transferred to Clean Fuel International Corp., a/k/a Gulf Coast Fuels, Inc., without Chrysalis receiving reasonably equivalent value for the transfer. [Finding of Fact No. 12 in the 2011 Opinion]; [Feb. 2, 2011 Tr. 136:19–21].

21. Between November 2006 and May 2007, the Debtor caused $11,240.00 of Chrysalis's funds to be transferred to CapNet Advisors Incorporated, without Chrysalis receiving reasonably equivalent value for the transfer. [Finding of Fact No. 13 in the 2011 Opinion]; [Pl's Ex. No. 5]. Indeed, in the Joint Pretrial Statement, the Debtor admits that he caused this transfer. [Adv. Doc. No. 61, p. 5 of 11].

22. During all of the transfers to the entities referred to above (the "Debtor–Controlled Entities"), Chrysalis was still operational. [Finding of Fact No. 13 in the 2011 Opinion].

23. In total, the Debtor made approximately 176 transfers to the Debtor–Controlled Entities for an aggregate amount of $1,161,279.90. [Pl's Ex. No. 5]. The Debtor "does not dispute that the transfers were made to insiders." [Adv. Doc. No. 121, p. 1, ¶ 1]. Further, the Debtor admitted that "Chrysalis had been threatened with suit at the time [ ] some of the transfers were made." [Id.]. Before the threat of a lawsuit, the Debtor orchestrated transfers totaling approximately $414,322.00; and after the threat, the Debtor orchestrated transfers totaling approximately $720,458.00—thereby resulting in a total amount of $1,134,780.00.[16] [Pl's Ex. No. 5].

24. During the trial, counsel for Husky asked the Debtor the following question: "It would have personally benefitted you for all of the entities that you owned an interest in to get $1.2 million, collectively,

---

16. There is a difference of $26,500.00 between the figure of $1,161,279.90 (which represents the total amount of the transfers) and the figure of $1,134,780.00 (which represents the sum of $414,322.00 and $720,458.00). There is no question that the Debtor made transfers of $26,500.00 to Clean Fuel International Corp., a/k/a Gulf Coast Fuels, Inc. However, the record is unclear as to whether these transfers were made before Husky's threat of a lawsuit or after Husky's threat of a lawsuit. Therefore, the Court has not included the figure of $26,500.00 in the "before and after the threat of a lawsuit" badge of fraud analysis. [See infra Part V.C.1.b.3].

from Chrysalis; would it not?" [Feb. 3, 2011 Tr. 67:11–13]. In response, the Debtor admitted: "[I]t would have benefitted me, yes, sir." [*Id.* at 67:14–15].

25. The Debtor testified that he believed the transfers of $1,161,279.90 were made to cover the "operational cash flow needs of Chrysalis" and to cover repayment of Chrysalis's loans. [Feb. 2, 2011 Tr. 101:14–16, 101:25–102:1]. However, the Debtor openly admitted, [Adv. Doc. No. 94, Feb. 11, 2011 Tr. 138:4–139:20], as did his former employee, Nancy K. Finney ("Finney"), [Feb. 3, 2011 Tr. 132:18–24], that there was absolutely no evidence to substantiate this testimony.

26. Finney, a comptroller for the Debtor–Controlled Entities, credibly testified that the Debtor himself controlled all of these transfers and authorized every single one. [*Id.* at 127:12–17]. The Debtor also admitted that he was responsible for initiating and authorizing many of the transfers. [*Id.* at 27:1–7]. The Court finds that the Debtor in fact initiated and authorized all of the transfers.

27. At all relevant times, the Debtor owned:

 a. 30% of Chrysalis, [Finding of Fact No. 14 in the 2011 Opinion], [Adv. Docket No. 8, p. 4,, ¶ 9(c) ];

 b. 85% of CapNet Securities Corporation, [Finding of Fact No. 14 in the 2011 Opinion], [Adv. Doc. No. 8, p. 4;, ¶ 9(c) ], (to which he transferred $121,831.00);

 c. 100% of CapNet Risk Management, Inc., [Finding of Fact No. 14 in the 2011 Opinion], [Adv. Doc. No. 8, p. 4,, ¶ 9(c) ], (to which he transferred $52,600.00);

 d. 100% of Institutional Insurance Management, Inc., [Finding of Fact No. 14 in the 2011 Opinion], [Adv. Doc. No. 8, p. 4, ¶ 9(c) ], (to which he transferred $172,100.00, or a portion thereof, with the other portion going to Institutional Capital Management, Inc.);

 e. 40% of Institutional Capital Management, Inc., [Finding of Fact No. 14 in the 2011 Opinion], [Adv. Doc. No. 8, p. 4, ¶ 9(c) ], (to which he transferred $172,100.00, or a portion thereof, with the other portion going to Institutional Insurance Management, Inc.);

 f. 25% of Dynalyst Manufacturing Corporation, [Finding of Fact No. 14 in the 2011 Opinion], [Adv. Doc. No. 8, p. 4, ¶ 9(c) ], (to which he transferred $99,386.90);

 g. 20% of Clean Fuel International Corp., a/k/a Gulf Coast Fuels, [Finding of Fact No. 14 in the 2011 Opinion], [Adv. Doc. No. 8, p. 4, ¶ 9(c) ], (to which he transferred $26,500.00);

 h. 10% of ComCon, [Feb. 2, 2011 Tr. 129:16–131:2], (to which he transferred $677,622.00); and

 i. No interest in CapNet Advisors Incorporated (to which he transferred $11,240.00), although he was a director, [*id.* at 79:11–15].

28. The Debtor's positions with the above-listed entities are as follows:

 a. He served as a director for Chrysalis, [*id.* at 79:17–19];

 b. From 2001 until the trial held in 2011, he held the title of Chief Executive Officer for CapNet Securities Corporation, [Adv. Doc. No. 94, Feb. 11, 2011 Tr. 53:20–21];

c. He served as a director of CapNet Risk Management, Inc., [Feb. 2, 2011 Tr. 80:3–7];

d. From 1996 to the date trial of the Adversary Proceeding was held in 2011, he served as president of Institutional Insurance Management, Inc., [Adv. Doc. No. 94, Feb. 11, 2011 Tr. 47:16–17];

e. From 1996 to the date trial of the Adversary Proceeding was held in 2011, he served as president of Institutional Capital Management, Inc., [Id. at 45:9–10];

f. From approximately 2002 to 2009, he served as a director of Dynalyst Manufacturing Corporation, [Feb. 10, 2011 Tr. 109:21–110:2];

g. He did not serve as a director or officer of Clean Fuel International Corp., a/k/a Gulf Coast Fuels; .

h. From 2006 to the date trial of the Adversary Proceeding was held in 2011, he served as a director of CapNet Advisors, Incorporated, [Feb. 2, 2011 Tr. 79:11–15]; [Adv. Doc. No. 94, Feb. 11 Tr. 62:8–17]; and

i. At some point, he also served as an officer and director of ComCon, [Adv. Doc. No. 94, Feb. 11, 2011 Tr. 79:8–14].

29. The Debtor retained signatory authority over the accounts of the following entities: (1) Institutional Capital Management, Inc.; (2) CapNet Securities Corporation; (3) CapNet Risk Management, Inc.; (4) CapNet Advisors, Incorporated; (5) Chrysalis; (6) Institutional Insurance Management, Inc.; and (7) Clean Fuel International Corp., a/k/a Gulf Coast Fuels. [Pl's Ex. No. 169].

## D. The Adversary Proceeding

30. As a result of the Debtor's orchestration of the transfers of funds out of Chrysalis's account to the Debtor–Controlled Entities, Husky suffered damages in the amount of $163,999.38—which represents the amount owed to Husky by Chrysalis for the goods that Husky delivered to Chrysalis (already defined as the $163,999.38 Debt). [Finding of Fact No. 15 in the 2011 Opinion]; [Pl's Ex. No. 2].

31. On March 31, 2010, Husky filed Plaintiff's Original Complaint to Deny Dischargeability of Debt Pursuant to 11 U.S.C. § 523 (the "Complaint"), which initiated the Adversary Proceeding. [Finding of Fact No. 1 in the 2011 Opinion]; [Adv. Doc. No. 1].

32. On January 13, 2011, the Debtor submitted answers to Husky's interrogatories. [Pl's Ex. No. 172]. Interrogatory No. 8(i) reads as follows:

[i]dentify (by name, address, and telephone number) every Person who caused any transfer of money to be made in any amount between November 2006 and May 2007 from Chrysalis to: (i) ComCon Manufacturing Services, Inc. ... and state the exact Dates and amounts of each such transfer of money each such Person made to the forgoing.

[Id.]. In response, the Debtor asserted that Marlin Williford made these transfers in his capacity as CFO for ComCon and Chrysalis and that he (i.e., the Debtor) "did not initiate nor authorize any of these transfers." [Id. at p. 4].

33. At trial, no exhibits were introduced and no testimony was adduced indicating that the Debtor made any oral or written represen-

tations to Husky inducing Husky to enter into the Master Credit and Sales Agreement. [Finding of Fact No. 16 in the 2011 Opinion]. The only communication that the Debtor ever had with Husky was a telephone conversation between Husky's founder and president, Davis, and the Debtor after the parties had entered into the Master Credit and Sales Agreement and Husky had already shipped components to Chrysalis. [*Id.*]; [*see supra* Finding of Fact No. 9].

## IV. CREDIBILITY [17]

### A. Husky's Witnesses

#### 1. Daniel Lee Ritz, Jr.

The Court finds that the Debtor is not a credible witness. During his testimony at trial, he gave answers which directly contradicted answers he had previously given in discovery. These contradictory statements relate to material issues. For example, his answer to Interrogatory No. 8(i) contradicts his testimony at trial on a very important issue. Interrogatory No. 8(i) reads as follows:

> [i]dentify (by name, address, and telephone number) every Person who caused any transfer of money to be made in any amount between November 2006 and May 2007 from Chrysalis to: (i) ComCon Manufacturing Services, Inc.... and state the exact Dates and amounts of each such transfer of money each such Person made to the forgoing.

[Finding of Fact No. 32]. The Debtor's answer was as follows: "Marlin Williford

was the primary person who managed these accounts. Defendant did not initiate nor authorize any of these transfers." [*Id.*]; [Pl's Ex. No. 172].

The language immediately above reflects a Shermanesque statement by the Debtor that he never initiated or authorized any transfers. Yet, at trial, under examination by Husky's counsel, the Debtor unequivocally admitted that he did authorize such transfers. [Feb. 2, 2011 Tr. 132:2–8]. Moreover, he could not offer any reasonable explanation as to why his answers were blatantly contradictory. [Feb. 3, 2011 Tr. 25:15–26:4]. On the witness stand, he claimed that he interpreted the interrogatory to mean that Husky wanted to know whether the Debtor personally transferred the funds—and the Debtor testified that he did not. [Feb. 2, 2011 Tr. 3–19]. This explanation is weak because the Debtor conceded that he authorized certain individuals to make transfers without the need for them to obtain his approval for each and every transfer. [*Id.* at 132:2–5]. Thus, his explanation is disingenuous, if not downright misleading.

And there is plenty more. For example, at trial, the Debtor testified that he disputes that Chrysalis owes any debt to Husky. [*Id.* at 91:1–3]. The Debtor then conceded he signed an affidavit on October 24, 2007 representing that Chrysalis did in fact owe a debt to Husky. [*Id.* at 96:21–23]; [Pl's Ex. No. 167] ("I entered into good faith negotiations, on behalf of Defendant Chrysalis, to settle all claims, avoid litigation and obtain a reduction from Plaintiff for any debts Defendant Chrysalis may

**17.** After the Fifth Circuit remanded the matter to this Court in August 2016, a status hearing was held, at which time the Court inquired of counsel for the parties as to whether they wanted to adduce additional testimony or introduce additional exhibits. They both declined. Accordingly, this Court has no reason to change its credibility findings from the findings made in the 2011 memorandum opinion. Hence, the credibility findings set forth herein are the same findings—with some additional citations to sources and footnotes.

owe.... Unfortunately, anticipated funds to satisfy *that* debt were not received and Chrysalis was unable to make it's [sic] timely payment.") (emphasis added). He later testified that he believes the debt is a little over $100,000.00. [Feb. 2, 2011 Tr. 97:9–16]. Within a few minutes, the Debtor went from completely disputing the debt, to representing that a debt is owed, to representing that the debt is in a fairly specific amount. This shell game underscores his lack of credibility.[18]

All in all, the record is replete with the Debtor's contradictions on several very germane issues in this suit. Additionally, his frequent inability to recall certain information was not coincidental. His ability to recollect was selective. Finally, the Debtor frequently gave non-responsive answers to questions which were unambiguous. His evasiveness and obfuscation further undermines his credibility. For all of the reasons set forth above, this Court finds the Debtor not to be a credible witness. The Court gives very little weight to his testimony.[19]

## 2. Nicolas C. Davis

Davis was the president of Husky. The Court finds that his testimony is very credible, and the Court gives substantial weight to this testimony.

## 3. Nancy K. Finney

Finney worked as a comptroller for several of the Debtor–Controlled Entities for approximately four years. The Court finds that her testimony is very credible, and the Court gives substantial weight to this testimony. Of particular significance, she testified that the Debtor made the decisions to transfer large sums of cash out of Chrysalis's operating account and into the accounts of other companies controlled by the Debtor. [Feb. 3, 2011 Tr. 127:2–19]; [Finding of Fact No. 26].

## 4. James D. Rogers

James D. Rogers ("Rogers") was Vice–President of Corporate Finance of CapNet Securities Corporation for approximately two and a half years. The Court finds that his testimony is very credible, and the Court gives substantial weight to this testimony. Of particular significance, he testified that the Debtor ran all of the operations of the various companies in which he had an interest. [Feb. 3, 2011 Tr. 158:1–13]. He also testified that he did not participate in, or have knowledge about, any transfers of funds from Chrysalis to the Debtor–Controlled Entities, [*id.* at 162:10–19]—which is contrary to the testimony given by the Debtor. The Court believes

---

**18.** Since the Court made its credibility findings in its memorandum opinion of August 4, 2011, the Court has reviewed the schedules that Chrysalis filed in its Chapter 7 case. The Debtor, in his capacity as a director of Chrysalis, submitted these schedules under oath. In schedule F, the Debtor, on behalf of Chrysalis, represented that Chrysalis owed Husky a debt of $162,487.65 and this Schedule F further represented that Chrysalis did not dispute this amount. [Finding of Fact No. 5(e)]. Thus, as of June 12, 2008, the date that the Schedule F was filed, the Debtor did not dispute that Chrysalis owed Husky a debt, a representation that directly contradicts his answer at trial that he disputes that Chrysalis owes any

debt to Husky. This is additional evidence reflecting the Debtor's poor credibility.

**19.** In making its findings of fact, this Court, even though it finds the Debtor not to be a credible witness, nevertheless cites his testimony, in some instances, as a basis for certain findings. The Court does so because the Debtor has been challenged on cross-examination and has owned up to the truth or, alternatively, the Debtor's testimony concerns a non-controversial point (at least in the Debtor's mind) about which he has no reason to obfuscate; or, alternatively, it is an admission against interest.

that Rogers told the truth and that the Debtor did not.

### 5. Richard Hollan

Richard Hollan ("Hollan"), at one time, owned shares of Institutional Capital Management, Inc.—which is an entity owned 40% by the Debtor. The Court finds that his testimony is very credible, and the Court gives substantial weight to this testimony. Of particular significance, Hollan testified that he has known the Debtor for approximately twenty-five years and does not have a high opinion of him. [*Id.* at 187:5–18]. Indeed, he testified that the Debtor is not trustworthy. [*Id.* at 187:15–16]. Finally, he testified that he is familiar with the Debtor's business practices, and that the Debtor controls all of the flow of money relating to corporations which he controls. [*Id.* at 185:1–186:2]

### B. The Debtor's Witnesses

### 1. Heather Cheaney

The Court finds Ms. Cheaney to be credible, but does not find her testimony to be significant on any important points. Therefore, the Court gives Ms. Cheaney's testimony little weight.

### 2. Daniel Lee Ritz, Sr.

While the Court finds Daniel Lee Ritz, Sr. to be a credible witness, the Court gives less weight to his testimony because it recognizes that many of his statements were—not unsurprisingly—aimed at helping his son's case.

### 3. Craig Takacs

The Court finds Mr. Takacs to be a bit evasive in his responses to the questions posed to him. Accordingly, the Court gives little weight to his testimony.

### 4. L. Andrew Wells

The Court does not find Mr. Wells to be a credible witness and, therefore, gives his testimony little weight.

### 5. Marlin R. Williford

The Court finds Mr. Williford to be direct and forthcoming in his testimony. Accordingly, the Court finds Mr. Williford to be a credible witness and gives his testimony significant weight. However, his testimony did not concern the transfers of cash that the Debtor orchestrated out of Chrysalis's operating account into the accounts of the Debtor–Controlled Entities.

## V. CONCLUSIONS OF LAW

### A. Jurisdiction, Venue, and Constitutional Authority to Enter a Final Judgment

### 1. Jurisdiction

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b). Section 1334(b) provides that "the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11 [the Code], or arising in or related to cases under title 11." District courts may, in turn, refer these proceedings to the bankruptcy judges for that district. 28 U.S.C. § 157(a). In the Southern District of Texas, General Order 2012–6 (entitled General Order of Reference) automatically refers all eligible cases and proceedings to the bankruptcy courts.

The matter at bar is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I) because the Court must determine whether the $163,999.38 Debt is a personal obligation that the Debtor owes to Husky that is non-dischargeable. Additionally, it is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(O) because a determination of whether the $163,999.38 Debt is a non-dischargeable personal obligation of the Debtor necessarily affects the debtor-cred-

itor relationship between Husky and the Debtor. Finally, the issue at bar is a core proceeding under the general "catch-all" language of 28 U.S.C. § 157(b)(2). *See In re Southmark Corp.*, 163 F.3d 925, 930 (5th Cir. 1999) ("[A] proceeding is core under § 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case."); *De Montaigu v. Ginther (In re Ginther Trusts)*, Adv. No. 06-3556, 2006 WL 3805670, at *19 (Bankr. S.D. Tex. Dec. 22, 2006) (holding that a matter may constitute a core proceeding under 28 U.S.C. § 157(b)(2) "even though the laundry list of core proceedings under § 157(b)(2) does not specifically name this particular circumstance"). Here, a suit over whether a particular debt is non-dischargeable can arise only in a bankruptcy.

### 2. Venue

Venue is proper under 28 U.S.C. § 1409(a) because the Adversary Proceeding arises under title 11 in that Husky seeks a judgment of non-dischargeability pursuant to an express provision of the Code: namely, § 523(a)(2)(A). Alternatively, venue is proper because the Adversary Proceeding is related to the Debtor's main Chapter 7 case.

### 3. Constitutional Authority to Enter a Final Judgment

In the wake of the Supreme Court's issuance of *Stern v. Marshall*, 564 U.S. 462, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011), this Court is required to determine whether it has the constitutional authority to enter a final order in any dispute pending before it. In *Stern*, which involved a core proceeding brought by the debtor under 28 U.S.C. § 157(b)(2)(C), the Supreme Court held that a bankruptcy court "lacked the constitutional authority to en-

ter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim." *Id.* at 503, 131 S.Ct. 2594. The pending dispute before this Court concerning whether the $163,999.38 Debt is a personal obligation of the Debtor that is non-dischargeable is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(I) and (O). *See also In re Brabham*, 184 B.R. 476, 482 (Bankr. D.S.C. 1995) ("[A] Bankruptcy Court should exercise its jurisdiction to determine issues of dischargeability of debts which are brought before it and must consider issues related to enforcement of the discharge injunction of § 524."); *In re Tulloch*, 373 B.R. 370, 375 (Bankr. D.N.J. 2007) ("Exception-to-discharge adversary proceedings are 'core proceedings' arising under title 11 and, as such, bankruptcy judges may 'hear and determine' such matters and 'enter appropriate orders and judgments' therein."). Because *Stern* is replete with language emphasizing that the ruling is limited to the one specific type of core proceeding involved in that dispute, this Court concludes that the limitation imposed by *Stern* does not prohibit this Court from entering a final judgment here. A core proceeding under 28 U.S.C. §§ 157(b)(2)(I) and (O) is entirely different than a core proceeding under 28 U.S.C. § 157(b)(2)(C). *See, e.g., Badami v. Sears (In re AFY, Inc.)*, 461 B.R. 541, 547–48 (8th Cir. BAP 2012) ("Unless and until the Supreme Court visits other provisions of Section 157(b)(2), we take the Supreme Court at its word and hold that the balance of the authority granted to bankruptcy judges by Congress in 28 U.S.C. § 157(b)(2) is constitutional."); *see also In re Davis*, 538 Fed.Appx. 440, 443 (5th Cir. 2013) *cert. denied sub nom. Tanguy v. W.*, —— U.S. ——, 134 S.Ct. 1002, 187 L.Ed.2d 851 (2014) ("[W]hile it is true that *Stern* invalidated 28 U.S.C. § 157(b)(2)(C) with respect to 'counterclaims by the estate

against persons filing claims against the estate,' *Stern* expressly provides that its limited holding applies only in that 'one isolated respect.' ... We decline to extend *Stern*'s limited holding herein.").

Alternatively, even if *Stern* applies to all of the categories of core proceedings brought under 28 U.S.C. § 157(b)(2), *see In re Renaissance Hosp. Grand Prairie Inc.*, 713 F.3d 285, 294 n.12 (5th Cir. 2013) ("*Stern*'s 'in one isolated respect' language may understate the totality of the encroachment upon the Judicial Branch posed by Section 157(b)(2) ...."), this Court still concludes that the limitation imposed by *Stern* does not prohibit this Court from entering a final judgment in the dispute at bar. In *Stern*, the debtor filed a counterclaim based *solely* on state law; whereas, here, the claim brought by Husky is based not only on state law (i.e. § 21.223 of the TBOC and § 24.005 of TUFTA), but also on an express provision of the Code—i.e., § 523(a)(2)(A) and judicially-created bankruptcy law interpreting this provision. This Court is therefore constitutionally authorized to enter a final judgment on the Complaint.

Finally, in the alternative, this Court has the constitutional authority to enter a final judgment in the Adversary Proceeding because Husky and the Debtor have consented, impliedly if not explicitly, to adjudication of this dispute by this Court. *Wellness Int'l Network, Ltd. v. Sharif*, —— U.S. ——, 135 S.Ct. 1932, 1947, 191 L.Ed.2d 911 (2015) ("Sharif contends that to the extent litigants may validly consent to adjudication by a bankruptcy court, such consent must be expressed. We disagree. Nothing in the Constitution requires that consent

to adjudication by a bankruptcy court be expressed. Nor does the relevant statute, 28 U.S.C. § 157, mandate express consent ...."). Indeed, Husky and the Debtor participated in a trial before this Court in 2011, [Findings of Fact Nos. 31–33]; participated in numerous appeals all the way up to the Supreme Court; filed post-hearing briefs in this Court after remand from the Fifth Circuit; and proceeded to make oral arguments at post-remand hearings— all without ever objecting to this Court's constitutional authority to enter a final judgment in this Adversary Proceeding. This Court finds that these circumstances constitute consent to this Court now entering a final judgment in this dispute.

**B. Pursuant to the Fifth Circuit's Remand Opinion, This Court Must Undertake a Three–Step Analysis to Determine if the $163,999.38 Debt is a Personal Obligation That the Debtor Owes to Husky That is Non–Dischargeable**

In this § 523(a)(2)(A) action, Husky "must show its entitlement to relief by a preponderance of the evidence." *In re Ryan*, 443 B.R. 395, 408 (Bankr. N.D. Tex. 2010) (citing *Grogan v. Garner*, 498 U.S. 279, 287, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991)). "A fact is proven by preponderance of the evidence if the finder of fact, here the court, finds it more likely than not, based on the evidence, that the fact is true." *Id.*

To prevail in this lawsuit, Husky must first prove that the Debtor is personally liable for the $163,999.38 Debt under applicable state law.[20] *Matter of Ritz*, 832

---

20. The Master Credit and Sales Agreement between Husky and Chrysalis includes a choice of law provision stating that it is governed by Colorado law. [Pl's Ex. No. 1]. However, in all of the hearings since 2011, neither

party has ever asserted that Colorado law governs the Adversary Proceeding. Moreover, the Joint Pretrial Statement references solely Texas law and leaves no doubt that Husky seeks to pierce Chrysalis's corporate veil to

F.3d at 566. Husky seeks to do this through § 21.223(b), "which allows a plaintiff to pierce the corporate veil and hold a shareholder, such as [the Debtor], liable for the debts of a corporation."[21] *Id.* To impose personal liability on the Debtor through § 21.223(b) of the TBOC. Thus, the Court finds that the parties have waived the Colorado choice of law provision. *See ARV Offshore Co., Ltd. v. Con–Dive, L.L.C.,* No. H-09-0944, 2012 WL 176322, at *6 (S.D. Tex. Jan. 20, 2012) (holding that a choice of law provision was waived when the issue was first raised in post-trial briefing and was not in the joint pretrial statement); *Meyer v. Callahan,* No. 09-cv-106-PB, 2010 WL 4916563, at *1 n.3 (D.N.H. Nov. 29, 2010) (finding that failure to brief on another state's law constituted a waiver of the right to use that law).

21. This Court notes that Chrysalis filed a Chapter 7 petition and that the Debtor, who signed Chrysalis's SOFA in his capacity as its director, failed to disclose the transfers of $1,161,279.90 that he withdrew from Chrysalis's account and transferred to the accounts of the Debtor–Controlled Entities. [Finding of Fact No. 4]. Additionally, in Chrysalis's Schedule B, no disclosure was made in item 21 of any claim that Chrysalis has against the Debtor for his transferring the amount of $1,161,279.90 out of Chrysalis's account into the accounts of the Debtor–Controlled Entities. [*Id.*]. Thus, the Chapter 7 trustee of Chrysalis's estate could have a cause of action on behalf of this estate against the Debtor for the amount of $1,161,279.90. *In re Moore,* 608 F.3d 253, 259–60 (5th Cir. 2010) (holding that state fraudulent transfer actions belong to the trustee); *see also Matter of S.I. Acquisition, Inc.,* 817 F.2d 1142, 1153 (5th Cir. 1987) (holding that the creditor's "alter ego action is a right of action belonging to [the corporate debtor] and, as such, is 'property of the estate' within the meaning of section 541(a)(1)" and thus may not be prosecuted by the individual creditor); *In re MortgageAmerica Corp.,* 714 F.2d 1266, 1277–78 (5th Cir. 1983) (holding that "a cause of action under the trust fund (denuding) theory is in the right of the corporation and, as such, is 'property of the estate' within the meaning of section 541(a)(1) of the Code" and thus, cannot be prosecuted by the individual creditor but rather can only be prosecuted by the Chapter 7 trustee). Indeed, because the disclosure of these transfers was not made, this Court will hold a hearing in Chrysalis's case to inquire of the trustee if he wants to bring suit against the Debtor for the amount of these transfers. Chrysalis's case was closed on February 23, 2009, [Case No. 08–33793, Doc. No. 15], and the docket sheet reflects that the trustee made no distribution of any property to Chrysalis's creditors. Nevertheless, a Chapter 7 case can be reopened when an asset that was not listed in the debtor's schedules comes to light. *In re Miller,* 347 B.R. 48, 53–54 (Bankr. S.D. Tex. 2006). Moreover, even though the Debtor has received a general discharge in his Chapter 7 case, [Main Case No. 09–39895, Doc. No. 32], this discharge does not necessarily give him a discharge from debts that he failed to disclose, *Matter of Stone,* 10 F.3d 285, 290–91 (5th Cir. 1994), and in his main case, the Debtor failed to schedule Chrysalis or the Chapter 7 trustee of the Chrysalis estate as a creditor holding a claim against him for his transferring the $1,161,279.90 out of Chrysalis's account into the accounts of the Debtor–Controlled Entities. [Finding of Fact No. 14]. Thus, the Trustee of Chrysalis's estate may want to pursue the Debtor, in his individual capacity.

Regardless of whatever cause of action the Chrysalis Chapter 7 trustee might have and might bring against the Debtor, Husky is in no way deprived from standing to sue the Debtor on a veil-piercing theory under § 21.223(b) to recover the $163,999.38 Debt that Chrysalis owes to Husky. The Fifth Circuit made this clear in its remand opinion. *Matter of Ritz,* 832 F.3d at 566 ("However, we agree with the district court that Husky's theory that Ritz is liable for the debt owed by Chrysalis to Husky under Texas law is legally viable and therefore remand for further factual findings on this theory."); *see also Estate of Vasquez–Ortiz v. Zurich Compania De Suguros,* No. H-11-2413, 2013 WL 105005, at *4 (S.D. Tex. 2013) ("Texas courts have recognized that a corporate form and an individual are mere alter egos 'when there is such unity between corporation and individual that the separateness of the corporation has ceased and holding on the corporation liable would result in injustice.' " In such instances, parties may bring claims directly against the corporation's owners instead of proceeding against the corporation alone.") (quoting *Castleberry v. Branscum,* 721 S.W.2d 270, 271 (Tex. 1986) *superseded by* Tex. Bus. Org. Code § 21.223); *TransPecos Banks v. Strobach,* 487

pierce the corporate veil and hold a shareholder personally liable requires a showing that the shareholder "caused the corporation to be used for the purpose of perpetrating and did perpetrate an *actual fraud on* the [plaintiff/creditor] primarily for the *direct personal benefit* of the [shareholder]." *Id.* (emphasis in original) (citing Tex. Bus. & Org. Code § 21.223(b)). Indeed, in its remand opinion, the Fifth Circuit stated that "if Husky can show that Ritz perpetrated an actual fraud for his direct personal benefit, then Ritz is liable for Chrysalis's debt to Husky under Texas law." *Id.* Thus, Husky has the burden to satisfy two elements: (1) actual fraud by the Debtor (2) perpetrated for the Debtor's personal benefit. *TransPecos*, 487 S.W.3d at 731 ("[T]he Legislature expressly placed the burden of proof on the corporate obligee to demonstrate that a corporate affiliate used the corporation to perpetrate an actual fraud on the oblige for his direct personal benefit."). If Husky can hurdle over these two requirements, then the $163,999.38 Debt becomes a personal obligation of the Debtor under state law. Husky will then need to jump over a third hurdle: namely, to prove that the Debtor's personal obligation to Husky under state law falls within the universe of debts that are nondischargeable under § 523(a)(2)(A).

**C. Piercing Chrysalis's Veil Under State Law to Impose Personal Liability on the Debtor for the**

**$163,999.38 Debt**

1. Step No. 1: Did the Debtor Commit "Actual Fraud" Under § 21.223?

 *a. The Two Avenues for Proving "Actual Fraud"*

In its remand opinion, the Fifth Circuit held that a plaintiff may satisfy the "actual fraud" prong of § 21.223 by showing that the Defendant effectuated fraudulent transfers under TUFTA. *Matter of Ritz*, 832 F.3d at 567–68. In the suit at bar, there is no doubt that the Debtor orchestrated numerous transfers out of Chrysalis's account into the accounts of the Debtor–Controlled Entities. [Findings of Fact Nos. 15–23]. Thus, there were certainly transfers, and now the question is whether they were fraudulent.

To prove that these transfers were fraudulent, Husky must show that the Debtor "made the transfer[s] … with actual intent to hinder, delay, or defraud [Husky]." Tex. Bus. & Com. Code Ann. § 24.005(a)–(a)(1)⋅ (WestlawNext 2015). How can Husky do so? There are two separate and distinct avenues available. One is to introduce direct evidence that the Debtor actually intended to hinder, delay, or defraud Husky when he made the transfers of $1,161,279.90 to the Debtor–Controlled Entities. For example, adducing testimony from the Debtor himself admitting that he intended to hinder, delay,

---

S.W.3d 722, 731 (Tex. App.–El Paso 2016, no pet.) ("We have also recognized that in adopting Section 21.223(b), the Legislature expressly placed the burden of proof on the *corporate obligee* to demonstrate that a corporate affiliate used the corporation to perpetrate an actual fraud on the oblige for his direct personal benefit."); *Morgan v. Fuller*, No. 07-15-00314-CV, 2016 WL 2766106, at *2 (Tex. App.–Amarillo May 11, 2016, no pet.) (holding that: "Normally, a shareholder may not be liable

for corporate obligations or debts … This general rule, though, has its exception. That exception arises where the *creditor demonstrates* that the shareholder caused the corporation to be used for the purpose of perpetrating and did perpetrate actual fraud on the creditor primarily for the direct personal benefit of the shareholder, beneficial owner, subscriber, or affiliate") (internal quotations omitted) (citing § 21.223(b)) (emphasis added).

or defraud Husky when he was orchestrating the transfers would definitely prove "actual fraud." Of course, adducing such testimony from the Debtor—or, for that matter, from anyone—is virtually impossible. "Rarely will a person who is guilty of fraudulent conduct admit his guilt. Thus, direct proof of fraudulent intent is rarely available." *In re Golchin*, 175 B.R. 366, 367–68 (Bankr. S.D. Cal. 1993) (internal citation and quotation omitted); *see also In re Rembert*, 141 F.3d 277, 282 (6th Cir. 1998) ("[A] subjective analysis of a debtor's fraudulent intent is extremely difficult to establish. Clearly, debtors have an incentive to make self-serving statements and will rarely admit an intent not to repay."); *In re Darby*, 376 B.R. 534, 540–41 (Bankr. E.D. Tex. 2007) ("Proving that actions by an individual are taken knowingly and with a fraudulent intent is not a simple matter, for rare will be the debtor who willingly provides direct evidence of a fraudulent intent."). Here, not surprisingly, the Debtor gave no testimony admitting that he intended to hinder, delay, or defraud Husky. Thus, Husky cannot satisfy this first element through the "direct evidence" approach.

The second approach for meeting this element is to introduce circumstantial evidence showing the defendant's intent to hinder, delay, or defraud. *In re 1701 Commerce, LLC*, 511 B.R. 812, 835–36 (Bankr. N.D. Tex. 2014) ("Direct evidence of actual fraud is seldom available, so Texas law allows a plaintiff to rely on circumstantial evidence to prove actual intent."). The Fifth Circuit, along with many other courts, allows this approach to be accomplished by a "badge of fraud" analysis. *Matter of Ritz*, 832 F.3d at 567–68; *Spring Street*, 730 F.3d at 437; *In re Soza*, 542 F.3d 1060, 1066–67 (5th Cir. 2008); *In re Acequia, Inc.*, 34 F.3d 800, 805–06 (9th Cir. 1994); *Max Sugarman Funeral Home, Inc. v. A.D.B. Investors*, 926 F.2d 1248,

1254–55 (1st Cir. 1991); *In re Sherman*, 67 F.3d 1348, 1353–54 (8th Cir. 1995). The specific badges of fraud set forth in TUFTA include the following:

(1) the transfer was to an insider;

(2) the debtor retained possession or control of the property transferred after the transfer;

(3) the transfer was concealed;

(4) before the transfer was made was incurred, the debtor had been sued or threatened with suit;

(5) the transfer was of substantially all the debtor's assets;

(6) the debtor absconded;

(7) the debtor removed or concealed assets;

(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor

Tex. Bus. & Com. Code Ann. § 24.005(b); *Matter of Ritz*, 832 F.3d at 568.

 In order to find the requisite intent, "several of these 'badges of fraud'" must be present. *Mladenka v. Mladenka*, 130 S.W.3d 397, 405 (Tex. App.–Houston [14th Dist.] 2004, no pet.) (finding that four badges of fraud are sufficient); *see also Tel. Equip. Network, Inc. v. TA/Westchase Place, Ltd.*, 80 S.W.3d 601, 609 (Tex. App.–Houston [1st Dist.] 2002, no pet.) (finding that five badges of fraud are sufficient); *In re SMTC Mfg. of Tex.*, 421 B.R. 251,

300 (Bankr. W.D. Tex. 2009) (finding that four or five badges of fraud are sufficient). However, the Fifth Circuit has held that "[n]ot all, or even a majority of the 'badges of fraud' must exist to find actual fraud." *In re Soza*, 542 F.3d at 1066; *see also Roland v. U.S.*, 838 F.2d 1400, 1402–03 (5th Cir. 1988) (interpreting TUFTA and finding "several" badges to be sufficient to find fraudulent intent). The evaluation of these badges to ascertain the Debtor's intent to hinder, delay, or defraud Husky necessarily involves an analysis of "all the facts and circumstances of [the] case." *Matter of Chastant*, 873 F.2d 89, 91 (5th Cir. 1989) (internal citation and quotation omitted).

Because "several" is far from specific, this Court, at the hearing held on December 16, 2016, addressed the meaning of this word and stated that Merriam–Webster's Dictionary defined "several" as "being more than two but fewer than many." [Tape Recording, Dec. 16, 2016 Hr'g at 2:06:44–2:07:30 P.M.]. Having determined that the dictionary definition is "more than two," this Court then stated on the record that three would be sufficient. [*Id.* at 2:07:30–2:07:33 P.M.]. Indeed, the District Court of the Southern District of Texas has held as follows: "But there is no bright-line rule that more than two badges of fraud must be found. *See Williams v. Houston Plants & Garden World, Inc.*, No. Civ. A. H-11-2545, 2014 WL 3665764, at —— 7–8 [sic] (S.D. Tex. July 22, 2014) (analyzing the cases Speer relies on and finding that they do not stand for a "bright-line" rule that three or fewer badges of fraud is insufficient). Courts and juries must consider all the factors and the "totality" of the circumstance." *Tow v. Speer*, No. H-11-3700, 2015 WL 1058080, at

*11 (S.D. Tex. Mar. 10, 2015). As discussed below, because at least six badges that have been expressly raised by Husky are present here, this threshold is definitely met in the suit at bar.[22]

It is unclear whether the Court may only consider badges affirmatively and specifically pled by Husky or if the Court may *sua sponte* consider other badges that are present based upon the evidence before the Court. *Compare Ritchie Capital Mgmt., LLC v. Stoebner*, 779 F.3d 857, 862–63 (8th Cir. 2015) ("Courts may consider any factors they deem relevant to the issue of fraudulent intent."); *and In re Tronox, Inc.*, 429 B.R. 73, 94 (Bankr. S.D. N.Y. 2010) ("Defendants' argument rests on the flawed contention that badges of fraud must be pled to satisfy Rule 9(b). While courts often allow parties to rely on badges of fraud because of the difficulty of proving intent, this is not a requirement."); *Kipperman v. Onex Corp.*, 411 B.R. 805, 853 (N.D. Ga. 2009) ("In determining whether the circumstantial evidence supports an inference of fraudulent intent, courts may look to a number of badges of fraud.") *with In re Lockwood Auto Group, Inc.*, 450 B.R. 557, 571 (Bankr. W.D. Pa. 2011) (only considering badges raised by the party accusing the debtor of fraudulent intent) *and DWS Int'l, Inc. v. Job*, No. 3:12-cv-339, 2013 WL 1438035, at *4 (S.D. Ohio Apr. 9, 2013) (refusing to consider a badge that was not affirmatively pled). Therefore, out of an abundance of caution, the Court first will consider only those badges raised by Husky. In doing so, this Court finds that there are a sufficient number of badges present to establish the Debtor's intent to hinder, delay, or defraud Husky when he was transferring the $1,161,279.90 out of Chrysalis's account

---

**22.** For a concise look of which badges of fraud are present in the suit at bar, see the chart included in the section entitled: *"Summary of All Thirteen of the Badges of Fraud Analyzed Above." See infra* Part V.C.1.e.

into the accounts of the Debtor–Controlled Entities. Thereafter, the Court will consider the additional badges not raised by Husky.[23]

In assessing each badge of fraud, it is necessary to ask this question: To which "debtor" does the particular badge refer? Given the circumstances in the dispute at bar, when this Court assesses whether each specific badge is present, the Court, in some instances, will be undertaking the analysis as if the "debtor" referred to in the particular badge is Chrysalis—as opposed to the Debtor himself; and in other instances, the Court will be undertaking the analysis as if the "debtor" referred to in the particular badge is the Debtor himself.

■ Finally, case law is clear that "[t]he Bankruptcy Court maintains full discretion to determine whether actual fraud existed in this matter and to assign a particular weight to each badge of fraud as it sees fit." *In re Piccinini*, 439 B.R. 100, 106 (E.D. Mich. 2010); *In re Zambrano Corp.*, 478 B.R. 670, 694 (Bankr. W.D. Penn. 2012) ("... [T]he significance of each existing badge of fraud must be considered.");

see also *In re Cohen*, 142 B.R. 720, 729 (Bankr. E.D. Penn. 1992) (giving more weight to the badges of " 'adequacy of consideration' and the effect of the transfer on the transferor's financial condition"). In the suit at bar, the Court does give substantial weight to certain badges of fraud that it analyzes.

*b. Husky has raised six of the eleven enumerated badges set forth in TUF-TA, and this Court finds that five of these badges are present*

■ Husky argues that the following badges are present: (1) the transfers were to an insider, [Adv. Doc. No. 80, Feb. 11, 2011 Tr. 6:23–7:1]; (2) the Debtor retained possession or control of the property transferred after the transfers were made, [Adv. Doc. No. 1, pp. 3–5]; (3) before the transfers were made, the Debtor had been sued or threatened with suit, [Adv. Doc. No. 80, Feb. 11, 2011 Tr. 7:21–8:2]; (4) the transfers were of substantially all of Chrysalis's assets, [*id.* at 8:22–9:3]; (5) the value of the consideration received by Chrysalis was not reasonably equivalent to the value of the funds transferred, [*id.* at 9:4–16]; and (6) Chrysalis was insolvent or

**23.** The undersigned judge has held that a bankruptcy court is bound by rulings issued by the district court in the district where the bankruptcy judge sits. *In re DePugh*, 409 B.R. 125, 131, 131 n.5 (Bankr. S.D. Tex. 2009). In *ASARCO*, the District Court for the Southern District of Texas issued an opinion containing one sentence that could be construed to mean that a plaintiff must actually plead a specific badge of fraud for the Court to consider it: "Lastly, there is not even a suggestion of the eleventh badge ...." *ASARCO v. Americas Mining Corp.*, 396 B.R. 278, 373–74 (S.D. Tex. 2008). Conversely, in the same opinion, there is language suggesting that the court *sua sponte* may consider any badge of fraud in making its decision: "... the statute provides only a non-exclusive list and the Court may look to other evidence in its efforts to determine [the defendant's] intent .... [The plaintiff] presented a number of additional facts

that provide circumstantial evidence that the Court may consider in determining whether [the defendant] had the requisite intent for Plaintiff to prevail on is actual-intent fraudulent transfer claim." *Id.* at 374. Because this Court believes it is bound by the District Court's ruling in *ASARCO*, but is not sure which principle to apply, this Court will proceed to *sua sponte* analyze those badges of fraud not raised by Husky. If this Court's ruling is appealed once more, the appellate court can decide which principle applies and then either discard this Court's *sua sponte* analysis or include it in its ruling. If the former, this Court nevertheless emphasizes that of the seven badges expressly raised by Husky, six are present—and this Court concludes that based upon existing precedent, the presence of six badges is sufficient to establish the Debtor's intent to hinder, delay, or defraud Husky.

became insolvent after the transfers were made, [*id.* at 8:3–21].

The Court addresses each of these badges in turn.

### 1) The Transfers were to an Insider

This first badge considers transfers to an insider. This badge "is so significant that in some cases an insolvent debtor's transfer to an insider has caused the court to make a finding of actual fraud in the absence of any other badges of fraud." *In re Toy King Dists., Inc.*, 256 B.R. 1, 129 (Bankr. M.D. Fla. 2000) (citing *Acequia*, 34 F.3d at 806).

First, TUFTA defines "transfer" as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance." Tex. Bus. & Com. Code § 24.002(12) (WestlawNext 2015). Second, TUFTA defines "insider"— in pertinent part—as "a corporation of which the debtor is a director, officer, or person in control." Tex. Bus. & Com. Code § 24.002(7)(A)(iv).

There is no doubt that the Debtor orchestrated transfers of assets (in the form of funds on deposit in Chrysalis's account) from Chrysalis's account to the accounts of the Debtor–Controlled Entities. [Findings of Fact Nos. 15–23]; *Matter of Smiley*, 864 F.2d 562, 565 (7th Cir. 1989) (noting that "any transfer of an interest in property is a transfer … [and a] deposit in a bank account or similar account is a transfer") (internal citation omitted). The total amount of the transfers was $1,161,279.90. [Finding of Fact No. 23]. Aside from effectuating these transfers, the Debtor was a director, officer, or person in control of the Debtor–Controlled Entities at the time he orchestrated these transfers. [Findings of Fact Nos. 1, 27, & 28]. Therefore, the Debtor–Controlled Entities are "insiders."

Indeed, the Debtor "does not dispute that the transfers were made to insiders." [Finding of Fact No. 23]. On these facts alone, the Court finds that a total of $1,161,279.90 was transferred to insiders, and therefore, this badge is present.

Moreover, " '[t]he cases which have considered whether insider status exists generally have focused on two factors in making that determination: (1) the closeness of the relationship between the transferee and the debtor; and (2) whether the transactions between the transferee and the debtor were conducted at arm's length.' " *Williams v. Houston Plants & Garden World, Inc.*, 508 B.R. 11, 17 (S.D. Tex. 2014) (quoting *Matter of Holloway*, 955 F.2d 1008, 1011 (5th Cir.1992)) (discussing insider transfers under TUFTA). It is obvious that the Debtor had an extremely close relationship with the Debtor–Controlled Entities: he owned 30% of, founded, and was a director and president of Chrysalis; he owned 100% of Institutional Insurance Management, Inc.; he owned 85% of and served as CEO for CapNet Securities Corporation; he owned 100% of and served as a director for CapNet Risk Management, Inc.; he owned 100% of and was president of Institutional Insurance Management, Inc.; he owned 40% of and was president of Institutional Capital Management; he owned 25% of and served as a director for Dynalyst Manufacturing Corporation; he owned 20% of Clean Fuel International Management, Inc.; and he owned 10% of and served as a director/officer for ComCon; and he was director of CapNet Advisors, Incorporated. [Findings of Fact Nos. 1, 27, & 28].

Further, the transfers orchestrated by the Debtor were hardly transactions conducted at arm's length. *See Williams*, 508 B.R. at 17; *see also Holloway*, 955 F.2d at 1011 (stating that when insiders are involved in transactions with one another,

they cannot be characterized as arm's-length transactions) (internal citation and quotation omitted). Also, the Debtor retained signatory authority over both the transferee and transferor companies. [Finding of Fact No. 29]; *see Nwokedi v. Unlimited Restoration Specialists, Inc.*, 428 S.W.3d 191, 206 (Tex. App.–Houston [14th Dist.] 2014, no pet.) (finding this badge to weigh against the defendant when the defendant "was a signatory on both accounts"). Indeed, Finney, the former comptroller of most of the Debtor–Controlled Entities, credibly testified that the Debtor was in control of all of these transfers and authorized every single one of them. [Finding of Fact No. 26].

In sum, there is no denying that the transfers of $1,161,279.90 from Chrysalis to the Debtor–Controlled Entities were transfers to insiders. *See Williams*, 508 B.R. at 17 (finding that the transfers were to "insiders" when the debtor owned the transferor and transferee companies). Thus, this badge is present and weighs heavily in favor of a finding of the Debtor's actual intent to hinder, delay, or defraud Husky.

## 2) The Debtor Retained Possession or Control of the Property Transferred After the Transfer

There is no question that the Debtor orchestrated transfers totaling $1,161,279.90 from Chrysalis's account to the accounts of the Debtor–Controlled Entities. [Finding of Fact No. 23]. There is also no question that the Debtor had substantial control of each of the Debtor–Controlled Entities: he was the majority shareholder in most of the entities, held various director and officer positions at each of the entities, maintained signatory authority over these various accounts, and even wholly owned some of the companies. [Findings of Fact Nos. 27–29]. Under these circumstances, this Court finds that

the Debtor retained possession or control of the $1,161,279.90 even after these funds were transferred out of Chrysalis's account. *See Nwokedi*, 428 S.W.3d at 206 (finding retention of possession when the transferor was the signatory on both the transferee and transferor accounts). Thus, this badge of fraud is present and weighs heavily in favor of a finding of the Debtor's actual intent to hinder, delay, or defraud Husky.

## 3) Before the Transfers were Made, the Debtor had been Sued or Threatened with Suit

In *1701 Commerce, LLC*, the court found this badge present when the creditors made demands on the debtor for payment before the debtor made transfers. 511 B.R. at 838–39. Specifically, the court found that such demands "were sufficient threats of suit for the purposes of fraud evidence." *Id.* at 838; *see also In re The Heritage Organization, L.L.C.*, 413 B.R. 438, 473–74 (Bankr. N.D. Tex. 2009) (finding demands for repayment sufficient to satisfy this badge). In another case, *Daniels v. Keenen*, the court held that: "The transfer after collection demands, even though those demands may not have explicitly threatened suit, may reasonably be considered as part of the evidence tending to prove an intent to hinder, delay, and defraud creditors." 19 B.R. 724, 731 n.30 (Bankr. W.D. Mo. 1982).

Here, Davis, the President and CEO of Husky, credibly testified that on or around January 12, 2007, i.e., after certain checks from Chrysalis bounced, he spoke with the Debtor. [Finding of Fact No. 9]. In that conversation, Davis not only demanded payment, but also actually threatened to sue: he informed the Debtor that if money was not wired immediately to pay for the products that Husky had delivered to Chrysalis, then Husky "would have to pursue litigation." [*Id.*]. Davis did not specify

that he intended to sue the Debtor individually or Chrysalis, but ultimately Husky filed lawsuits against both the Debtor and Chrysalis. [Finding of Fact No. 9, 11, & 12]. Further, the Debtor admits that "Chrysalis had been threatened with suit at the time [ ] some of the transfers were made." [Finding of Fact No. 23].

After the demand for payment *and* the threat of a lawsuit, the Debtor continued to make transfers out of Chrysalis's accounts to the accounts of the Debtor–Controlled Entities. In total, the Debtor effectuated transfers of $720,458.00 to the Debtor–Controlled Entities after the threat. [Finding of Fact No. 23]. The Court finds that this is ample evidence to prove that transfers were made after Husky threatened to file suit. *1701 Commerce, LLC*, 511 B.R. at 838–39. Thus, this badge of fraud is present and weighs heavily in favor of a finding of the Debtor's actual intent to hinder, delay, or defraud Husky.

#### 4) The Transfer was of Substantially All the Debtor's Assets

Numerous courts have found that for this badge to be present, a significant percentage of the debtor's assets must have been transferred. For example, in *1701 Commerce, LLC*, the court held that this badge was present because the property transferred was "six or seven times the combined value of [the debtor's] remaining assets." 511 B.R. at 839. In *Citizens State Bank Norwood Young Am. v. Brown*, 849 N.W.2d 55, 64 (Minn. 2014), the Court held that his badge was present because the property that was transferred was approximately 95% of the debtor's total assets.

Here, as of March 31, 2006, Chrysalis had assets of approximately $2.4 million. [Finding of Fact No. 3(c) ]. Further, from January to March 2007, Chrysalis had assets valued at $2.1 million. [Finding of Fact No. 3(f) ]. Meanwhile, between No-

vember of 2006 and May of 2007, the Debtor caused $1,161,279.90 to be transferred from Chrysalis to the Debtor–Controlled Entities. [Finding of Fact No. 23]. $1.13 million is approximately one-half of Chrysalis's assets, but is not—like the cases cited above—85% or 95% of total assets. Stated differently, 50% of total assets is not substantially all of Chrysalis's assets. *See ASARCO*, 396 B.R. at 373–74 (refusing to find that a transfer was substantially all of the assets when the transferred asset was the most valuable, but not enough to be "substantially all" of the assets); *Bank of Am., N.A. v. Fulcrum Enters., LLC*, 20 F.Supp.3d 594, 605 (S.D. Tex. 2014) (finding that the badge is present where the judgment debtor admitted that the transferred assets "represented all or substantially all of [defendant's] assets"), *contra In re Vaso Active Pharms., Inc.*, Adv. No. 11-52005 (CSS), 2012 WL 4793241, at *14 (Bankr. D. Del. Oct. 9, 2012) ("Defendants argue that transfer of anything less than 50% of Debtor's assets is not substantially all of those assets. That cannot be the case....One can easily imagine substantially all of a company's asset being less than a majority ....").

Under these circumstances, the Court finds that this badge of fraud is not present in the suit at bar.

#### 5) The Value of the Consideration Received was Reasonably Equivalent to the Value of the Asset Transferred

 "The test for 'reasonably equivalent value' is whether the net economic effect of the transfer was a dissipation of the debtor's estate." *In re WRT Energy Corp.*, 282 B.R. 343, 405 (Bankr. W.D. La. 2001). Further, "the fair market value of what the debtor gave and received must be valued objectively and from the perspective of the debtor's creditors, without regard to the subjective needs or perspec-

tives of the debtor or transferee." *Id.* at 407.

There is no evidence whatsoever that Chrysalis received any consideration from the Debtor–Controlled Entities; the transfers of $1,161,279.90 simply dissipated Chrysalis's estate. The Debtor testified that he believed these transfers occurred to cover the "operational cash flow needs of Chrysalis" and to cover repayment of various loans that the Debtor–Controlled Entities had extended to Chrysalis. [Finding of Fact No. 25]. Stated differently, the Debtor wants this Court to believe that Chrysalis owed debts (both loans and trade debt) to the Debtor–Controlled Entities and that therefore the transfers of $1,161,279.90 effectuated by the Debtor were done to pay off debts incurred by Chrysalis in the ordinary course of its business. However, there was no documentation introduced into evidence to substantiate that the Debtor–Controlled Entities extended any loans or provided any goods or services to Chrysalis, [*id.*] and given the Debtor's very poor credibility, the Court gives no weight to this particular testimony. Thus, given that the record here is much like the record and the holdings in *Williams* and *Porras*, this Court holds that Chrysalis received no value in exchange for the $1,161,279.90 transfers that the Debtor made to the Debtor–Controlled Entities. *See Williams v. Houston Plants & Garden World, Inc.*, 508 B.R. 19, 27 (S.D. Tex. 2014) (finding this badge present when there was no evidence to show consideration); *see also In re Porras*, 312 B.R. 81, 102, 105 (Bankr. W.D. Tex. 2004) (finding this badge present when the debtors only made self-serving statements about value and did not describe consideration in a way that was colorable). Indeed, this Court heard no persuasive argument from the Debtor's counsel at the post-remand hearing that would lead this Court to change its original finding that the various transfers had occurred "without Chrysalis receiving equivalent value for the transfer." *Ritz*, 459 B.R. at 628. Thus, this badge of fraud is present and weighs heavily in favor of a finding of the Debtor's actual intent to hinder, delay, or defraud Husky.

### 6) The Debtor was Insolvent or Became Insolvent Shortly After the Transfers were Made

Under TUFTA, a debtor is insolvent if "the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation," and a debtor is presumed to be insolvent if the debtor does not pay its debts as they become due. Tex. Bus. & Com. Code. § 24.003(a)–(b) (WestlawNext 2015); *see also ASARCO*, 396 B.R. at 373 (finding that the debtor corporation was insolvent when it lacked the ability to pay its debts and had "unreasonably small assets"). There is no doubt that Chrysalis was insolvent at the time the Debtor transferred the $1,161,279.90 out of Chrysalis's account into the accounts of the Debtor–Controlled Entities. [Finding of Fact No. 3]. Indeed, in the 2011 memorandum opinion, this Court previously found that "[a]t all relevant times, the sum of Chrysalis's debts were greater than all of Chrysalis's assets at a fair valuation." *Ritz*, 459 B.R. at 628. It did so—and does so now—because, among other reasons, the Debtor himself admitted that: (1) he was not aware of any time when the assets were greater than the liabilities, [Finding of Fact No. 3(a) ]; (2) in March 2006, Chrysalis had assets of $2.4 million and liabilities of $5.6 million, a net negative equity of $3.2 million, [Finding of Fact No. 3(c) ]; (3) as of March 2007, the numbers were even worse: $7.68 million in liabilities and only $2.1 million in assets, for a net negative equity of $5.36 million, [Finding of Fact No. 3(f) ]; (4) Chrysalis was never able to pay its bills at any point in time,

[Finding of Fact No. 3(h) ]; and (5) around April or May 2007, EmlinQ purchased Chrysalis's assets for $600,000.00—a number lower than Chrysalis's accounts payable. [Finding of Fact No. 3(d) ].

Indeed, there is sufficient evidence proving that Chrysalis was insolvent before the Debtor ever began making the numerous transfers to the Debtor–Controlled Entities in the fall of 2006. [*See* Findings of Fact Nos. 3(a)–(h) ]. First, Finney credibly testified that on or around October 2006, Chrysalis became unable to pay its bills and obligations as they became due. [Feb. 3, 2011 Tr. 130:10–17]. Second, she testified that Chrysalis was unable to pay its payroll taxes to the government. [*Id.* at 134:9–19]. Third, Chrysalis had accounts payable of $640,031.54 that were more than 90 days past due as of April 21, 2006. [Finding of Fact 3(d) ]. Fourth, the Debtor conceded that "Chrysalis was having some pretty serious problems and was unable to pay its bills, at least some of them, as and when they became due as far back as April 21, 2006" and that the situation never improved. [Finding of Fact No. 3(h) ]; [Feb. 3, 2011 Tr. 22:20–23:23].

Fifth, the Debtor himself testified that "the company's [i.e., Chrysalis's] assets were less than what was owed." [Adv. Doc. No. 94, Feb. 11, 2011 Tr. 91:22–92:4]. Sixth, as already noted, he testified that he was not aware of any time when the assets were greater than the liabilities. [*Id.* at 92:11–16]; [Finding of Fact No. 3(a) ]. Seventh, as elicited by his attorney, the Debtor testified that Chrysalis "needed capital" the entire time he was involved with the company. [Adv. Doc. No. 94, Feb. 11, 2011 70:22–71:6].

Because the evidence overwhelmingly shows that Chrysalis's debts always exceeded its assets, this Court finds that Chrysalis was insolvent before any of the transfers of $1,161,279.90 were made, was insolvent during the time when all of the transfers were made, and remained insolvent after all of the transfers were made. Further, there is a presumption of Chrysalis's insolvency because the evidence demonstrates convincingly that it was unable to pay its debts as they came due; and the Debtor certainly has not overcome this presumption based upon the record made at trial. For all of these reasons, this badge of fraud is present and weighs heavily in favor of a finding of the Debtor's actual intent to hinder, delay, or defraud Husky.

In sum, out of the eleven enumerated badges of fraud set forth in TUFTA, Husky has raised six of these badges, and this Court finds that five of them are present. As already noted previously, the presence of five badges of fraud is sufficient, *see In re Soza,* 542 F.3d at 1066 n.5; *Roland,* 838 F.2d at 1402–03; and here, taken together, the five badges of fraud that are present weigh heavily in favor of a finding of the Debtor's actual intent to hinder, delay, or defraud Husky. Under these circumstances, this Court finds that Husky has met its burden under TUFTA to prove the Debtor's actual intent to hinder, delay, or defraud Husky, and therefore, Husky has satisfied the "actual fraud" element of § 21.223.

c. *With respect to the five enumerated badges of fraud under TUFTA that Husky did not raise, the Court, sua sponte, now considers these badges and finds that four of them are present*

Husky did not raise the other five badges of fraud expressly set forth in § 24.005(b) of TUFTA, but the Court will address them *sua sponte.*[24] These badges

24. *See supra* note 23.

include: (1) the transfer was concealed; (2) the debtor absconded; (3) the debtor removed or concealed assets; (4) the transfer occurred shortly before or shortly after a substantial debt was incurred; and (5) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor. Out of these additional five badges, the Court finds that four are present, thus further establishing the Debtor's actual intent to hinder, delay, or defraud Husky.

### 1) The Transfers Were Concealed

Black's Law Dictionary defines "conceal" as "the act of refraining from disclosures; . . . an act by which one prevents or hinders the discovery of something." Black's Law dictionary 282 (7th ed. 1999). In *In re Adeeb*, the court found that there was no concealment when a debtor attempted to undo all the transfers made before he filed his bankruptcy petition. 787 F.2d 1339, 1345 (9th Cir. 1986). In another case, a bankruptcy court found that a "debtor who fully discloses his property transactions at the first meeting of creditors is not fraudulently concealing property." *In re Waddle*, 29 B.R. 100, 103 (Bankr. W.D. Ky. 1983) (citing *In re Doody*, 92 F.2d 653 (7th Cir. 1937)). By contrast, in *Smiley*, the court found concealment when the debtor had made various pre-petition transfers but failed to reverse the transfers before filing bankruptcy. *Matter of Smiley*, 864 F.2d at 566.

Here, when Chrysalis filed its Chapter 7 petition on June 12, 2008, the Debtor, in his capacity as Chrysalis's director, signed the SOFA, thereby representing under oath that all representations made therein were accurate. [Finding of Fact No. 4]. Yet, they were not. This is so because section 10 of the SOFA, entitled "other transfers," required Chrysalis (through its director, the Debtor) to do the following: "List all other property, other than prop-

erty transferred in the ordinary course of the business or financial affairs of the debtor, transferred either absolutely or as security within two years immediately preceding the commencement of this case." [Case No. 08–33793, Doc. No. 3, p. 47 of 54]. The sworn answer given by the Debtor was that Chrysalis had not transferred any property within two years preceding the filing of its bankruptcy petition (i.e., within the two years prior to June 12, 2008). [Finding of Fact No. 4]. The Debtor thus completely failed to disclose that Chrysalis had transferred cash totaling $1,161,279.90 to the Debtor–Controlled Entities for the seven-month period between November 2006 and May 2007—which is within the two-year window of June 12, 2008. [Findings of Fact Nos. 15–23]. These transfers were definitely not within the ordinary course of Chrysalis's business or financial affairs; there is absolutely no documentation evidencing that these transfers were payments made by Chrysalis in the ordinary course of its business to retire loans or trade debt extended by the Debtor–Controlled Entities. [Finding of Fact No. 25].

Thus, Chrysalis's SOFA reflects that the Debtor was concealing from Chrysalis's creditors (including Husky) the transfers of $1,161,279.90 that the Debtor had orchestrated from Chrysalis's account into the accounts of the Debtor–Controlled Entities. The Court likens this to: (1) the debtors' failure to disclose at the first meeting of creditors in *Waddle* the transfers that they had made there; and (2) the debtor's failure in *Smiley* to reverse the transfers. Further, the Debtor made no attempt to reverse the transfers like in *Adeeb*; nor did the Debtor, in his capacity as director of Chrysalis, take it upon himself to file an amended SOFA disclosing the transfers totaling $1,161,279.90. *Compare Williams*, 508 B.R. at 16 ("The sec-

ond amended financial statement discloses the transfers that [the Chapter 7 trustee] seeks to avoid. On the present record, [the Chapter 7 Trustee] has not established that, as a matter of law, the transfers were concealed."). Further, the Debtor, in his capacity of director of Chrysalis, did not list on Chrysalis's Schedule B any claim that Chrysalis might have against him, individually, for his transferring the $1,161,279.90 out of Chrysalis's account into the accounts of the Debtor–Controlled Entities. [Finding of Fact No. 4].

Under all of these circumstances, this Court finds that that the Debtor concealed from Husky the transfers of $1,161,279.90 to the Debtor–Controlled Entities when he failed to disclose them on Chrysalis's SOFA and when he failed to disclose on Chrysalis's Schedule B that the company might have a cause of action against him, personally. Thus, this badge of fraud is present and weighs in favor of a finding of the Debtor's actual intent to hinder, delay, or defraud Husky. The Court gives this badge significant weight in no small part because the Debtor made material misrepresentations under oath on Chrysalis's SOFA and Schedule B. His failure to disclose the transfers of $1,161,279.90 and the cause of action against himself are not "[m]atters so trivial in nature as to have but little effect upon the estate and upon creditors ...." *Waddle*, 29 B.R. at 103.

### 2) The Debtor Absconded

There is no evidence that the Debtor absconded. This badge is not present.

### 3) The Debtor Removed or Concealed Assets

In *Vaso Active Pharmaceuticals, Inc.*, the court found this badge present when the defendants received payments from the debtor that the debtor failed to disclose to creditors. 2012 WL 4793241, at *12–14. As a result of a third-party settlement, the debtor received the funds to make certain payments, the proceeds of which should have gone first to a secured creditor; instead, the funds were funneled to insiders of the debtor, which then failed to inform the creditors of the transfer. *Id.* at *5–6, 12. The court found these actions to constitute concealment of assets when the defendants failed to disclose to the creditors the "basis for and the amount of the payments from the Debtor's assets to [the defendants]." *Id.* at *14; *see also In re Womble*, 289 B.R. 836, 855 (Bankr. N.D. Tex. 2003) (finding "a classic badge of fraud" when the debtor transferred funds to a wholly-owned corporation on the eve of bankruptcy because it was clear the transfers were done to diminish the debtor's personal estate knowing he was about to file for bankruptcy).

Here, the Debtor did not disclose to Husky or any other creditors the amounts of and reasons for the transfers of $1,161,279.90 to the Debtor–Controlled Entities. Husky was entitled to payment for providing products to Chrysalis, and like the creditor in *Vaso*, was kept in the dark by the Debtor about his transfers of $1,161,279.90 to the Debtor–Controlled Entities. This is sufficient evidence for this Court to find that the Debtor concealed Chrysalis's assets. Indeed, the evidence presented at trial also leads this Court to find that the Debtor, by transferring the $1,161,279.90 out of Chrysalis's account into the accounts of the Debtor–Controlled Entities, removed assets of Chrysalis— "which is sufficient proof of this badge of fraud even without a finding of concealment." *See Tow*, 2015 WL 1058080, at *12. Further, the Debtor here, just like the defendant in *Tow*, does not dispute the evidence that he removed $1,161,279.90 from Chrysalis's account. [Finding of Fact No. 23]. Therefore, this badge is present and favors a finding of the Debtor's actual intent to hinder, delay, or defraud Husky.

### 4) The Transfer Occurred Shortly Before or Shortly After a Substantial Debt was Incurred

The last invoice Chrysalis received from Husky was on January 9, 2007. [*See* Findings of Fact Nos. 7 & 8]. And, there is no question that Chrysalis owed Husky the amount of $163,999.38 on or about this date. [Findings of Fact Nos. 7 & 30]. Under § 24.002(5), debt "means a liability on a claim" and under § 24.002(3), claim "means a right to payment or property, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." Here, the $163,999.38 Debt is a right to payment that Husky holds against Chrysalis that is liquidated. Thus, there is no question that the $163,999.38 Debt is a "debt" under TUFTA. The question is whether the $163,999.38 Debt is a "substantial debt."

The Court finds that this is a substantial debt. The Court makes this finding because a review of the schedules of non-insider unsecured creditors that Chrysalis filed in its Chapter 7 case reflects that Chrysalis represented that the debt owed to Husky was $162,487.65—which is by far and away one the largest debts of the numerous unsecured debts set forth in Chrysalis's schedules. [Finding of Fact No. 5(e) ]. Most of the unsecured debts scheduled by Chrysalis are under $5,000.00; there are some debts in the $10,000.00 to $50,000.00 range; one debt totals $141,070.68; and only one debt exceeds the

amount owed to Husky, and that is the debt for $228,000.00 to Arrow Electronics. [*Id.*]. Thus, Husky is the holder of the second largest non-insider unsecured debt in Chrysalis's case, and this debt (amounting to $163,999.38) represents approximately 10% of the total amount of non-insider unsecured debts. Under these circumstances, this Court finds that the debt owed by Chrysalis to Husky was a "substantial debt" as of January 9, 2007.[25]

So, the question is now whether the transfers orchestrated by the Debtor out of Chrysalis's account into the accounts of the Debtor–Controlled Entities took place "shortly before" or "shortly after" January 9, 2007. The evidence reflects that many of these transfers occurred from November 10, 2006 up to January 9, 2007—with the total amount of these transfers coming to $414,322.00. [Pl's Ex. No. 5]; [Finding of Fact No. 23]. The evidence also reflects that many of these transfers occurred from January 9, 2007 to May 11, 2007—with the total amount of these transfers coming to approximately $720,458.00. [Pl's Ex. No. 5]; [Finding of Fact No. 23]. The Court finds that the transfers that occurred for the two months prior to January 9, 2007 occurred sufficiently "shortly before" the substantial debt was incurred that this badge is satisfied. The Court further finds that the transfers that occurred for the four months immediately after January 9, 2007 occurred sufficiently "shortly after" the substantial debt was incurred; and that therefore, this badge is also satisfied in this respect.

---

25. Chrysalis, through the Debtor as its director, also scheduled debts owed to insiders, including a debt of $866,511.65 to ComCon and a debt of $1,620,912.53 to Institutional Capital Management, Inc. [Case No. 08-33793, Doc. No. 3, pp. 15 & 23 of 54]. However, as already discussed herein, there is no documentary evidence that these entities extended loans to Chrysalis, and this Court gives no weight to the Debtor's testimony that such loans existed. The Court therefore does not take into account these alleged loans when making its determination that the bona fide debt of $163,999.38 that Chrysalis owes to Husky constitutes a "substantial debt" for purposes of evaluating this particular badge of fraud.

Case law supports this Court's finding that the temporal element of this particular badge is satisfied. In *In re Hill*, 342 B.R. 183, 202 (Bankr. D.N.J. 2006), the court held that a transfer that occurred four months after the creation of a substantial debt was sufficiently "shortly after" the debt's creation that the badge was present in that suit. *See also Tex. Custom Pools, Inc. v. Clayton*, 293 S.W.3d 299, 313–14 (Tex. App.–El Paso 2009, no pet.) (finding three months to come within the "shortly after" time period). In those cases where the temporal element has not been satisfied, it is because the transfer took place nine months after the debt arose, *SMTC*, 421 B.R. at 313; two years after a loan was made, *In re CRCGP LLC*, Adv. No. 07-3117, 2008 WL 4107490, at *19 (Bankr. S.D. Tex. Aug. 28, 2008); and fourteen years after a contractual debt was incurred, *Waste Mgmt. v. Danis Indus. Corp.*, No. 3:00-cv-256, 2009 WL 347773, at *17 (S.D. Ohio Feb. 10,2009).

For all of these reasons, the Court finds that this badge of fraud is present and weighs heavily in favor of a finding of the Debtor's actual intent to hinder, delay, or defraud Husky.

**5) The Debtor Transferred the Essential Assets of the Business to a Lienor Who Transferred the Assets to an Insider of the Debtor**

One of the Debtor–Controlled Entities—ComCon—was a lienor by virtue of the fact that it held a security interest on virtually all of Chrysalis's assets. [Finding of Fact No. 3(e) ]. The Debtor oversaw the transfer of $677,622.00 from Chrysalis's account to the account of ComCon, [*id.*]; therefore, the Debtor transferred essential assets of Chrysalis to a lienholder (i.e., ComCon). The Debtor was both an officer and director, as well as a 10% shareholder, of ComCon, [Findings of Fact Nos. 27(h) & 28(i) ]—which means that the funds that

the Debtor transferred from Chrysalis's account to ComCon's account was in fact a transfer of assets to an insider of the Debtor. *See* Tex. Bus. & Com. Code § 24.002(7)(A)(iv) (defining "insider"—in pertinent part—as "a corporation of which the debtor is a director, officer, or person in control."); *see also* § 101(31)(A)(iv) (Code section defining "insider" as a "corporation of which the debtor is a director, officer, or person in control"). Thus, Chrysalis transferred essential assets out of its business to a lienholder (ComCon), a company on whose account the Debtor had signature authority and therefore could ensure that its funds could be used to pay down this corporation's debt that the Debtor himself had personally guaranteed—circumstances that effectively constitute ComCon's transferring the funds to the Debtor himself. Under these circumstances, the Court finds that this badge of fraud is present and favors a finding of the Debtor's actual intent to hinder, delay, or defraud Husky.

*d. There Are Two Additional Badges Not Expressly Enumerated in § 24.005(b) of TUFTA that Reveal the Debtor's Intent to Hinder, Delay, or Defraud Husky*

TUFTA states that when determining whether a transfer was fraudulent, "consideration may be given, *among other factors*, to" the eleven enumerated badges of fraud. Tex. Bus. & Com. Code § 24.005(b) (emphasis added). Further, the Fifth Circuit has held that the eleven factors set out in TUFTA are "non-exclusive." *In re Soza*, 542 F.3d at 1066. Stated differently, the "list is not exhaustive, [and] a court may also consider other suspicious facts suggesting that a transfer was made with actual fraudulent intent." *1701 Commerce, LLC*, 511 B.R. at 836. Therefore, this Court will consider additional "suspicious facts" to aid in the finding that the Debtor

intended to hinder, delay, or defraud Husky from collecting the $163,999.38 Debt. Husky has raised one set of these "suspicious facts," and this Court, *sua sponte*, has focused on a different set of "suspicious facts."

### 1) The Debtor's Lack of Credibility

At the hearing held in this Court on December 16, 2016, counsel for Husky argued that because the list of badges is "non-exclusive," an additional "badge of fraud" could be the Debtor's lack of personal credibility. [Tape Recording, Dec. 16, 2016 Hr'g at 1:56:40–1:57:52 P.M.]; *See e.g.*, *CRCGP*, 2008 WL 4107490, at *20 (considering as an additional badge of fraud "the Defendants' lies to federal banks"). He argued that it was evidence of the Debtor's fraudulent intent for the Debtor to have represented hundreds of transfers as loan repayments without any documentation and that it was "pretty vague, and pretty conclusory and pretty thin" for the Debtor to ask the Court to just accept this proposition without any evidence. [Tape Recording, Dec. 16, 2016 Hr'g at 1:58:40–1:58:53 P.M.]. The Court agrees.

The Fifth Circuit has found that "debtors with business acumen ... are to be held to a higher standard." *In re Jordan*, 927 F.2d 221, 226 (5th Cir. 1991), *overruled on other grounds, Coston v. Bank of Malvern (In re Coston)*, 991 F.2d 257 (5th Cir. 1993); *In re Mutschler*, 45 B.R. 482, 492 (Bankr. D. N.D. 1984) ("Where the debtor is an individual of intelligence and experience in financial matters, courts have been more inclined to hold him responsible for uttering a false financial statement."). Here, the Debtor has held himself out as an experienced businessman; in fact, the Debtor testified that he was very experienced about securities and corporations, stock options, and supervising businesses that deal with trading. [Feb. 2, 2011 Tr.

69:1–73:10]. He also testified that he founded, or helped found, and had various supervisory roles at, different companies since at least 2002. [Finding of Fact. No. 28]; [Feb. 2, 2011 Tr. 76:16–81:13].

Thus, the Debtor, as an experienced businessman, should know that when there are approximately 176 intercompany transfers between entities in which he holds interests, [Finding of Fact No. 23], for such transfers to be considered "repayment of loans," there *must* be supporting documentation. *Bartley Tex. Builders Hardware, Inc. v. Swor*, No. 07-03280, 2008 WL 5378068, at *4 (S.D. Tex. Dec. 24, 2008), *rev'd on other grounds, In re Swor*, 347 Fed.Appx. 113 (5th Cir. 2009) ("A loan is a capital contribution when payments correlate with the debtor's sense of his financial situation and the debtor repays the money at his own discretion."). For him to ask this Court to rely on the proposition that such transfers were loans without a shred of documentary evidence is, at the very least, a "suspicious fact." Therefore, this Court finds that the Debtor's lack of credibility is an additional badge of fraud. This presence of this additional badge favors a finding of the Debtor's actual intent to hinder, delay, or defraud Husky.

### 2) The Debtor Lied on Chrysalis's SOFA and Schedule B

Deceit committed in bankruptcy schedules and SOFAs comes with grave consequences. In one case, the Fifth Circuit vacated a confirmation order and an order authorizing conversion from Chapter 7 to Chapter 13 when the debtor committed fraud because he was fully aware of two judgments against him exceeding $500,-000.00—but failed to list them on his schedules. *In re Nikoloutsos*, 199 F.3d 233, 238 (5th Cir. 2000). In another case, fraud under § 24.005(b) of TUFTA was found when, among other reasons, the debtor

failed to list a $73,500.00 loan on his schedules. *In re Schmidt,* Adv. No. 07-03068, 2007 WL 2456959, at *9 (Bankr. N.D. Tex. Aug. 24, 2007); *see also In re Dereve,* 381 B.R. 309, 331 (Bankr. N.D. Fla. 2007) (finding a badge of fraud when the debtor failed to list assets on her schedules).

Here, the Debtor lied on Chrysalis's SOFA. As stated previously, the Debtor had a duty to disclose the transfers Chrysalis made in the two years preceding its petition date of June 12, 2008. [Finding of Fact No. 4]. The transfers of $1,161,279.90 made to the Debtor–Controlled Entities from November 2006 through May 2007 were within this two-year window. The Debtor admitted that these transfers occurred, [Findings of Fact Nos. 15–23], and therefore, *knew they happened during that time,* but he nevertheless failed to disclose them on Chrysalis's SOFA. [Case No. 08–33793, Doc. No. 3, p. 47 of 54]. Moreover, on Chrysalis's Schedule B, the Debtor, in his capacity as the director of Chrysalis completing and filing this schedule, failed to set forth that Chrysalis had a claim against him personally for his orchestration of the transfers of $1,161,279.90 out of Chrysalis's account into the account of the Debtor–Controlled Entities. Therefore, the Court concludes that the omissions on Chrysalis's SOFA and Schedule B are additional "suspicious facts" that weigh against the Debtor and evidences his actual intent to hinder, delay, or defraud Husky.

### e. Summary of All Thirteen of the Badges of Fraud Analyzed Above

This Court has reviewed thirteen badges of fraud—the eleven enumerated badges set forth in TUFTA, plus two other badges that are particularly germane to the suit at bar. Of these thirteen badges of fraud, Husky raised seven of them, six of which are present. This Court, *sua sponte,* has reviewed six other badges, five of which are present. Thus, a total of eleven badges of fraud are present. The chart set forth below summarizes the badge of fraud analysis that this Court has undertaken:

| | Badge of Fraud[26] | Was the badge raised by Husky? | Was the badge raised *sua sponte* by the Court? | Is the badge present? |
|---|---|---|---|---|
| | 1. The transfers were to an insider | Yes | No | Yes |
| | 2. The debtor retained possession or control of the property transferred after the transfer | Yes | No | Yes |
| | 3. The transfers were concealed | No | Yes | Yes |
| | 4. Before the transfers were made, the debtor had been sued or threatened with suit | Yes | No | Yes |
| | 5. The transfers were of substantially all of the debtor's assets | Yes | No | No |
| | 6. The debtor absconded | No | Yes | No |
| | 7. The debtor removed or concealed assets | No | Yes | Yes |
| | 8. The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred | Yes | No | Yes |
| | 9. The debtor was insolvent or became insolvent shortly after the transfers were made | Yes | No | Yes |
| | 10. The transfer occurred shortly before or shortly after a substantial debt was incurred | No | Yes | Yes |
| | 11. The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor | No | Yes | Yes |
| | *12. The debtor's lack of credibility* | *Yes* | *No* | *Yes* |
| | *13. The Debtor lied on Chrysalis's Statement of Financial Affairs and Schedules* | *No* | *Yes* | *Yes* |
| **Totals** | | **Husky raised seven badges** | **The Court considered six badges *sua sponte*** | **Eleven badges are present** |

[**Editor's Note** The preceding image contains the references for footnote [26]]

Eleven badges are more than sufficient to find that the Debtor intended to hinder or delay Husky's collection of the $163,999.38 Debt, or to defraud Husky out of recovering the $163,999.38 Debt. *See Mladenka*, 130 S.W.3d at 405 (finding that four badges of fraud is sufficient); *see also Tel. Equip. Network*, 80 S.W.3d at 609 (finding that five badges of fraud is sufficient); *SMTC*, 421 B.R. at 300 (finding that four or five badges of fraud is sufficient). Indeed, the Fifth Circuit has held that "[n]ot all, or even a majority of the 'badges of fraud' must exist to find actual

**26.** For reference, the first eleven badges of fraud are enumerated in § 24.005(b) of TUFTA. The twelfth and thirteenth badges (in italics) are additional badges not expressly enumerated in TUFTA that this Court finds appropriate to analyze because the TUFTA list is not exhaustive and these badges further suggest the transfers were made with fraudulent intent. *1701 Commerce, LLC*, 511 B.R. at 836.

fraud." *In re Soza*, 542 F.3d at 1066 (interpreting TUFTA); *see also Roland*, 838 F.2d at 1402–03 (interpreting TUFTA and finding "several" badges to be sufficient to find fraudulent intent). And, even if this Court only considers the seven badges raised by Husky, six of those badges are present, and this number is also sufficient to establish that the Debtor intended to hinder or delay Husky's collection of the $163,999.38 Debt, or to defraud Husky out of recovering the $163,999.38 Debt.

In its remand opinion, the Fifth Circuit stated that in this Court's original opinion, this Court "never drew the inference from its factual findings that [the Debtor's] transfers here were made 'with actual intent to hinder, delay, or defraud any creditor.'" *Matter of Ritz*, 832 F.3d at 568. The Fifth Circuit therefore remanded this dispute "for additional fact finding as to whether [the Debtor's] conduct satisfies the actual fraud prong of TUFTA." *Id.* at 569. Given the badge of fraud analysis set forth above, this Court now unequivocally makes a finding that the Debtor's transfers of the $1,161,279.90 were made with the actual intent to hinder, delay, or defraud Husky under TUFTA.

*f. The Debtor Has Failed to Rebut the Presumption of Fraud Raised by the Presence of the Eleven Badges Referenced Above*

 A finding of fraud raised by the presence of multiple badges "may be rebutted if a legitimate purpose exists for the transfers." *1701 Commerce, LLC*, 511 B.R. at 841–42; *Sugarman Funeral*, 926 F.2d at 1254–55 (holding that "the confluence of several [badges of fraud] can constitute conclusive evidence of an actual intent to defraud, absent 'significantly clear' evidence of a legitimate supervening purpose"); *In re Stanley*, 384 B.R. 788, 800 (Bankr. S.D. Ohio 2008). The court in *1701 Commerce* noted that:

Courts have accepted a number of purposes as legitimate, including raising capital, restructuring financial obligations, releasing guaranties, seizing upon good investment opportunities, and encouraging management's financial commitment to an enterprise. In comparison, other courts have rejected purported purposes as illegitimate when the transfers deviated from standard business practices, were poorly documented, were intended to convert non-exempt assets into exempt property, or were supported only by the testimony of a witness found not to be credible. Four factors identified by the Fifth Circuit to gauge whether a transfer's alleged purpose was legitimate include whether the transfer was: (1) pursuant to a standard business practice; (2) an arm's-length transaction; (3) voluntary or effectively forced upon the debtor; and (4) for proper consideration

*1701 Commerce, LLC*, 511 B.R. at 841–42 (citing *In re Moreno*, 892 F.2d 417, 420–21 (5th Cir. 1990)).

Set forth below is a discussion of various arguments articulated by the Debtor in an effort to rebut the presumption of fraud raised by the numerous badges that are present. The Court finds that none of the Debtor's arguments fall within the "legitimate purpose" categories articulated by the Fifth Circuit and other courts.

**1) Even if the Debtor Infused Funds into Chrysalis He Cannot Overcome this Court's Conclusion that He Hindered, Delayed, or Defrauded Husky under TUFTA**

The Debtor argues that he has rebutted Husky's evidence on "actual fraud" by introducing evidence that the Debtor, although he orchestrated withdrawals of $1,161,279.90 out of Chrysalis's account, also saw to it that cash was infused into Chrysalis. Indeed, at the post remand

hearing, the Debtor's counsel argued that his client infused approximately $2.4 million within the six-month period prior to Chrysalis shutting down its operations in the summer of 2007, and thus argued that even though his client effectuated cash outflows of $1,161,279.90, he effectuated cash infusions of $2.4 million—and thus "actually put a million dollars more between this four month time period into the company than he took out." [Tape Recording Dec. 16, 2016 Hr'g at 2:03:50–2:04:24 P.M.]. How, asks the Debtor, could he possibly have intended to defraud Husky when he was infusing more funds *into* Chrysalis than he was withdrawing? Stated differently, the Debtor's argument is that he was making every effort to keep Chrysalis's operations alive—eventually hoping to achieve profitability—so that Chrysalis could repay all of its debts, including the $163,999.38 Debt; and, therefore, he could not possibly have had the intent required to establish that he defrauded Husky.

The Court rejects this argument. It does so because there is no proof of any infusion of $2.4 million into Chrysalis during the first half of 2007—i.e., when much of the $1,161,279.90 transfers orchestrated by the Debtor took place. Indeed, the Debtor himself testified that the $2.4 million infusion occurred in 2005 and 2006, with approximately $2.3 million of this total being infused in 2005. [Finding of Fact No. 3(b) ]. Thus, during the first half of 2007, the Debtor was draining Chrysalis of cash, and he has offered no acceptable explanation of why he orchestrated these transfers. The Debtor has failed to prove "by a preponderance of the evidence[ ] that [he] had a legitimate purpose in making the transfer." *SMTC*, 421 B.R. at 299 (citing *Kelly v. Armstrong*, 141 F.3d 799, 802–03 (8th Cir. 1998)).

Even assuming, however, that the Debtor did infuse $2.4 million of cash into Chrysalis during the first half of 2007, he cites no case law that these circumstances overcome the presumption of fraudulent intent relating to his orchestration of the transfers of $1,161,279.90 to the Debtor–Controlled Entities. Nonetheless, this Court has found one case where a bankruptcy court addressed the issue in a somewhat similar fact pattern.

In *In re Scarpello*, 272 B.R. 691 (Bankr. N.D. Ill. 2002), a creditor prosecuted a complaint to determine dischargeability against a debtor pursuant to §§ 523(a)(2)(A), (a)(4), and (a)(6). *Id.* at 697. The court denied the § 523(a)(2)(A) claim by holding that the creditor had failed to demonstrate that the debtor possessed the requisite intent to deceive her. *Id.* at 701. The court also denied the § 523(a)(4) claim on the grounds that the debtor's breach of contract "is not functionally equivalent to fiduciary fraud, defalcation, embezzlement, or larceny." *Id.* at 703. The court then addressed the § 523(a)(6) claim. In finding that the creditor had failed to prove that the debtor's conduct had been "willful and malicious," the court stated the following:

> The Creditor's strongest argument lies under § 523(a)(6) because unquestionably the actions of the Debtor caused the Creditor an injury in her property interest in the proceeds. The Debtor's actions were the effective conversion of the account proceeds for the Debtor's benefit and use. It is clear that the Debtor's wrongful conduct in converting the proceeds was an intentional act, but the evidence failed to demonstrate that the Debtor, at all times, intended to cause the Creditor the requisite injury. *The Debtor's replenishing of the account through subsequent deposits of proceeds from severance pay and retirement funds, after she had made some initial*

*withdrawals, is more probative of her intent not to cause the Debtor injury. Moreover, her subsequent offers to make installment payments and utilize the perceived equity from the sale of her home in satisfaction of the debt, negates the requisite showing of subjective intent to injure the Creditor.* The Debtor's loss of employment, dissolution of her marriage and the attendant loss of benefits from her former spouse, effectively precluded her from performing her stated intent to reimburse the Creditor. The Court finds the Debtor's testimony that she always intended to and still intends to reimburse the Creditor for her conversion of the account proceeds credible. Therefore, the Creditor failed to establish all of the requisite elements. Accordingly, the Court finds the debt owed by the Debtor to the Creditor dischargeable under § 523(a)(6).

*Id.* at 704–05 (emphasis added).

There is no question that the bankruptcy court in *Scarpello* found that the debtor's replenishing her account through subsequent deposits tended to prove that she did not intend to cause injury to the creditor. If the *Scarpello* court had stopped there, this Court would find this case fairly persuasive support for the argument lodged by the Debtor here. However, the Court in *Scarpello* went on to observe that the debtor offered to pay back the debt that was the subject of the lawsuit, not only by making installment payments but by selling her homestead and using the sale proceeds to pay the creditor. *Id.* It was this offer made by the debtor that seemed to convince the *Scarpello* court of the debtor's lack of intent to defraud the creditor. In the suit at bar, there is no evidence whatsoever that the Debtor himself has ever offered to pay the $163,999.38 Debt or to sell any of his personal assets to help pay a portion of this debt. In this Court's view, the distinction is material;

and therefore, this Court does not find the Debtor's argument persuasive.

There is a further point. The statute requires a plaintiff to prove that the defendant, through his actions, intended to "hinder, delay, *or* defraud" the plaintiff. Tex. Bus. & Com. Code § 24.005(a)(1) (emphasis added). The court in *In re Brentwood Lexford Partners, LLC*, 292 B.R. 255 (Bankr. N.D. Tex. 2003), held that

> Under both the Bankruptcy Code and Texas law, the intent to hinder or delay or defraud are three separate elements. Each one on its own may make a transfer fraudulent. Thus, an intent merely to delay, but not ultimately prevent, a creditor from being repaid is generally sufficient to trigger the requisite culpability required by the statute.

*Id.* at 262–63; *see also Matter of Perez*, 954 F.2d 1026, 1028 (5th Cir. 1992) (upholding lower court finding that under § 727(a)(2)(A) debtor had "transferred property ... with the intent to, if not defraud his creditors, at least hinder or delay their discovery of and access to certain assets.") (internal quotation and citation omitted). This Court would be remiss to interpret this language any other way "in light of the 'plain meaning' of the words, which the Supreme Court has cautioned 'should be conclusive, except in cases where the literal interpretation produces a result demonstrably at odds with the intention of the drafters.'" *In re Wiggains*, Adv. Case. No. 14–03064, 2015 WL 1954438, at *16 (Bankr. N.D. Tex. Apr. 27, 2015) (quoting *United States v. Ron Pair Enterps., Inc.*, 489 U.S. 235, 242, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989)). In extrapolating on this phrase, the *Wiggains* court found that:

> The Bankruptcy Code does not define an intent to "hinder" or an intent to "delay." According to the Oxford English

Dictionary, the term "hinder" means to "keep back, delay; impede; obstruct; prevent." It defines "delay" as "put off to a later time; postpone, defer." In keeping with this plain meaning, courts have held that a debtor acts with an intent to "hinder" if he or she acts with ". . . an intent to impede or obstruct" creditors and an intent to "delay" if he or she acts with ". . . an intent to slow or postpone creditors." Others have stated more generally that in order to act with "intent to hinder or delay" is to "act improperly to make it more difficult for a creditor to collect a debt." Whether a debtor acts with "actual intent to hinder, delay, or defraud" is a fact-specific inquiry.

*Id.* at *17 (internal citations omitted).

Here, Husky has argued that even if this Court does not find that the Debtor defrauded Husky by making the transfers of $1,161,279.90 to the Debtor–Controlled Entities, the Debtor's actions certainly hindered or delayed Husky's ability to collect the $163,999.38 Debt. [Adv. Doc. No. 129, pp. 6–8]. The Court agrees. It is without doubt that by orchestrating the transfers of the $1,161,279.90 from Chrysalis to the Debtor–Controlled Entities, the Debtor hindered Husky because such actions "ke[pt] back, delay[ed], impede[d], obstruct[ed], and prevent[ed]" Husky's collection efforts. *Wiggains*, 2015 WL 1954438, at *17. Alternatively, the actions also delayed Husky by forcing Husky to wait over six years since the $163,999.38 Debt originally arose, thereby postponing Husky's collection of the $163,999.38 Debt. *Id.* Indeed, if the Debtor had really wanted to ensure that Chrysalis paid the $163,999.38 Debt, he could have directed Chrysalis to use some of the alleged $2.4 million cash infusions to pay this obligation; or, rather than orchestrating cash transfers of $1,161,279.90 out of Chrysalis, he could have transferred a lesser amount

and used the difference to pay the $163,999.38 Debt.

Thus, even if this Court accepted the Debtor's argument that his infusion of funds totaling $2.4 million into Chrysalis negates any intent to defraud Husky—and the Court most certainly does not accept this argument—the Court would still find that the infusion of the $2.4 million does not negate the hindering and delaying of Husky's ability to collect the $163,999.38 Debt by the Debtor's transferring of $1,161,279.90 out of Chrysalis's account into the accounts of the Debtor–Controlled Entities.

### 2) The Debtor Failed to Prove that the Transfers to the Debtor–Controlled Entities were Repayments of Loans

The Debtor also attempts to justify the transfers to the Debtor–Controlled Entities as "repayment of loans." [Finding of Fact No. 25]. This argument woefully fails. To prove such a defense, the Debtor must have done so by a preponderance of the evidence and shown this Court that he "had a legitimate purpose in making the transfer[s]." *SMTC*, 421 B.R. at 251. Further, "[t]he absence of either documentation of the loan or interest payments indicates capital rather than debt." *In re Swor*, 347 Fed.Appx. 113, 116 (5th Cir. 2009) (internal citation and quotation omitted). While a repayment of a loan would be a legitimate purpose if supported by evidence, the Debtor *openly admitted,* as did his former employee, Finney, that there was absolutely no evidence to prove any loans. [Finding of Fact No. 25]. Therefore, this argument fails.

### 3) The Debtor's Personally Guaranteeing One of Chrysalis's Debts in 2007 Does Not Overcome this Court's Conclusion that that He Hindered, Delayed, or Defrauded Husky under TUFTA

■■■ Another argument that the Debtor raises to justify the transfers to the

Debtor–Controlled Entities is that he made personal guaranties for Chrysalis in order to keep the business running and pay all creditors, so how could he possibly possess the intent to defraud Husky? [Adv. Doc. No. 121, p. 10 of 13]. Husky argues that this is not a logical defense because the Debtor only personally guaranteed Chrysalis's debt of $177,000.00 to Arrow Electronics, Inc. [Finding of Fact No. 3(g)]. This guaranty, Husky argues, is *de minimus* compared to the amount of personal liability that the Debtor put himself in the position of eliminating when he made the transfers of $677,622.00 to ComCon, one of the Debtor–Controlled Entities whose loan of $1.0 million the Debtor had personally guaranteed. [Finding of Fact No. 15].

The Court agrees with Husky. The Court is required to evaluate all the facts and circumstances surrounding the transfers, *see Chastant*, 873 F.2d at 91, and by doing so, in the above scenario, the Debtor put himself in the position of gaining a net personal benefit of $823,000.00 (i.e., $1.0 million minus $177,000.00). The Debtor is not as benevolent as he would have this Court believe. It is clear that he personally guaranteed one of Chrysalis's debts but he obviously did not put his neck on the line for the company by transferring $1,161,279.90 to the Debtor–Controlled Entities; rather, he utilized Chrysalis to funnel money into the Debtor–Controlled Entities, some of which he held a 100% ownership interest in—thereby effectively putting money into his own pocket.

Thus, the Debtor's arguments do not overcome the presumption of fraud raised by the eleven badges of fraud already discussed herein. The presence of these eleven badges of fraud establishes the Debtor's intent to delay, hinder, or defraud Husky under TUFTA; and, because Husky has met its burden under TUFTA,

Husky has therefore proven that the Debtor committed "actual fraud" under § 21.223. Husky has therefore satisfied the first test of § 21.223.

### 2. Step No. 2: Was the Debtor's "actual fraud" for his direct personal benefit?

██ The second part of the test to consider in order for the Court to find that Husky may pierce Chrysalis's corporate veil under § 21.223(b) requires the Debtor to have derived a personal benefit from the transfers that he orchestrated to the Debtor–Controlled Entities. Tex. Bus. & Org. Code § 21.223(b); *Matter of Ritz*, 832 F.3d at 569. In its remand opinion, the Fifth Circuit did not provide this Court with guidance of what constitutes a "personal benefit," but rather simply held that "[i]f the bankruptcy court concludes on remand that Ritz's conduct satisfies the actual fraud prong of TUFTA and that the actual fraud was for Ritz's 'personal benefit,' ... then Ritz is liable for Chrysalis's debt to Husky under Texas's veil-piercing statute...." *Id.* at 569.

In the first instance, this Court does not need to worry about the definition of "personal benefit." This is so because the Debtor himself specifically testified that the transfers he made to the Debtor–Controlled Entities were for his personal benefit. [Finding of Fact No. 24]. Specifically, counsel for Husky asked: "It would have personally benefitted you for all of the entities that you owned an interest in to get $1.2 million, collectively, from Chrysalis; would it not?" [*Id.*]. In response, the Debtor admitted that: "[I]t would have benefitted me, yes, sir." [*Id.*].

Further, the Debtor testified that it would have been a personal benefit to him for Chrysalis's funds to be paid to the company for which he had a personal guaranty. [*Id*]. And, indeed, the Debtor saw to it that of the $1,161,279.90 that Chrysalis

transferred to the Debtor–Controlled Entities, the amount of $677,622.00 went into the account of ComCon, [Finding of Fact No. 15]; by doing so, the Debtor ensured that ComCon was put in a much better position to pay the $1.0 million loan that it owed for which the Debtor had personally executed a guaranty. [*Id.*]. There is therefore no doubt that the transfers from Chrysalis to ComCon personally—and directly—benefitted the Debtor. *Compare TransPecos*, 487 S.W.3d at 736 (finding that no personal benefit was shown because the defendant "never distributed any of the Corporation's capital assets to herself or anyone else") *with In re Morrison*, 361 B.R. 107, 120 (Bankr. W.D. Tex. 2007) ("However, [the debtor] was the majority stockholder and President of [the company]. He alone ran the company and made all the decision regarding its operation. Any benefit to [the company] was a personal benefit to [the debtor].").

Even if the Debtor had not conceded that the transfers of $1,161,279.90 personally benefitted him, this Court would still hold that he did receive a personal benefit. Although the Fifth Circuit did not elaborate on what constitutes "personal benefit" in *Ritz*, it has issued rulings on this concept in other cases. Perhaps most analogous to the suit at bar is *Thrift v. Estate of Hubbard*. In that case, the veil was pierced to reach the shareholders when they used funds that should have been used to make payments to the corporation's lender and instead were used to make payments to one of the shareholders. *Thrift v. Estate of Hubbard*, 44 F.3d 348, 354–55 (5th Cir. 1995) (interpreting Tex. Bus. Corp. Act Ann. Artc. 2.21(A), which has since been replaced with § 21.223(b)); *see also Spring Street*, 730 F.3d at 445 (finding that there was a personal benefit when there were fraudulent transfers made to "evade individual liability").

In another case, *In re Morrison*, the majority stockholder and president of the company received a personal benefit when he knew of the "dire financial condition of his company," made all the decisions regarding the company's operations, and made a misrepresentation on financial statements in order to draw in business. 361 B.R. at 120. Further, in *In re JNS Aviation, LLC*, 376 B.R. 500, 531 (Bankr. N.D. Tex. 2007), the court found that sole owners of both the transferor company and transferee company received a personal benefit when they transferred the company assets in order to continue business instead of paying the lender of the transferor company. The court in *JNS Aviation* further found that the actions must have been for the owners' personal benefit because "[n]o other shareholders (members) existed. They had no other interest to serve." *Id.*

There are various circumstances when courts have found that an individual has not derived a personal benefit under § 21.223(b). For example, when the record fails to show whether the defendant deposited the funds in his own personal account or used them to purchase personal items or pay personal debts, there will be no finding of personal benefit. *Solutioneers Consulting, Ltd. v. Gulf Greyhound Partners, Ltd.*, 237 S.W.3d 379, 388 (Tex. App.– Houston [14th Dist.] 2007, no pet.). Another example is when there were transfers, but the accused shareholder ceased drawing a salary, paid pass-through shareholder taxes, and lost money; moreover, the accused shareholder did not himself have any interest in the entity to which the assets were conveyed. *Rimade Ltd. v. Hubbard Enterprises, Inc.*, 388 F.3d 138, 146 (5th Cir. 2004). On the other hand, a Texas court has held that there was a personal benefit where an operator of a company who made the transfers also had a direct ownership and financial interest in

the transferee companies. *McCarthy v. Wani Venture, A.S.*, 251 S.W.3d 573, 591 (Tex. App.–Houston [1st Dist.] 2007, pet. denied).

In the suit at bar, the Debtor's behavior is more comparable to the cases in *Hubbard, Spring Street, Morrison, JNS Aviation,* and *McCarthy.* First, similar to *Hubbard,* the Debtor transferred funds from Chrysalis to ComCon, a corporation whose $1.0 million loan the Debtor had personally guaranteed, [Finding of Fact No. 15]; and by effectuating these transfers to ComCon, the Debtor put ComCon in a much better position to pay off the loan that the Debtor had personally guaranteed, [*id.*]. Meanwhile, the transfers of these funds out of Chrysalis's account resulted in Chrysalis not paying the debt it owed to Husky, a debt the Debtor had not personally guaranteed. [Finding of Fact No. 3(g) ]. Second, similar to *JNS Aviation,* the Debtor used the funds to continue the businesses of his other companies instead of paying creditors of Chrysalis. [*See* Findings of Fact Nos. 15–25]. Third, all of the funds that were transferred out of Chrysalis's account went into the accounts of the Debtor–Controlled Entities, and the Debtor had a close connection to these entities, as he served as the only shareholder or the majority shareholder in most of these entities. [Finding of Fact No. 27]. This is remarkably similar to *JNS Aviation* and *McCarthy,* and the holdings there ring true here: if there were no other interested parties in these companies, how could any of these transfers *not* be for the Debtor's personal benefit? Finally, even if the transfers provided some benefit to the Debtor–Controlled Entities themselves, it must be remembered that § 21.223(b) requires only that Husky show that the transfers were *"primarily* for the direct personal benefit" of the Debtor." (emphasis added).

Under all of the circumstances described above, this Court finds that Husky has proven that the transfers from Chrysalis to the Debtor–Controlled Entities were made primarily for the Debtor's personal benefit. Therefore, Husky has met its burden to prove both prongs of § 21.223—i.e., actual fraud and personal benefit. In its remand opinion, the Fifth Circuit stated that "[i]f the bankruptcy court concludes on remand that [the Debtor's] conduct satisfies the actual fraud prong of TUFTA and that the actual fraud was for [the Debtor's] 'direct personal benefit,' ... then [the Debtor] is liable for Chrysalis's debt. to Husky under Texas's veil-piercing statute ...." *Matter of Ritz,* 832 F.3d at 569. Thus, the trade debt of $163,999.38 owed to Husky by Chrysalis (i.e., the $163,999.38 Debt) is, by virtue of the successful piercing of Chrysalis's veil, now also owed to Husky by the Debtor, in his individual capacity.

However, the analysis does not stop here. In its remand opinion, the Fifth Circuit made it clear that even if this Court finds that the Debtor personally owes the $163,999.38 Debt by virtue of Husky's successful veil-piercing, this Court "must then address whether [the Debtor] should be denied a discharge under § 523(a)(2)(A), consistent with the Supreme Court's opinion in this case." *Matter of Ritz,* 832 F.3d at 569. The Court now examines this issue.

3. Step No. 3: Is the Debtor's Personal Liability for the $163,999.38 Debt a Non–Dischargeable Obligation Under § 523(a)(2)(A)?

Section 523(a)(2)(A) states, in pertinent part for this suit, that a debtor will not receive a discharge "from any debt for money ... to the extent obtained by ... actual fraud." The Supreme Court has declared that the phrase "to the extent obtained by" modifies "money," not "any debt." *Cohen v. De La Cruz,* 523 U.S. 213,

218, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998). Therefore, in the suit at bar, in order for Husky to establish that the Debtor's personal liability for the $163,999.38 Debt is non-dischargeable, Husky must show the following: (1) money was obtained; (2) obtaining the money was done through the Debtor's actual fraud; and (3) as a result of these circumstances, a personal debt of the Debtor was created.

First, the record reflects that money was obtained. Specifically, the Debtor transferred $1,161,279.90 out of Chrysalis's account into the accounts of the Debtor–Controlled Entities. [Finding of Fact No. 23]. Thus, the Debtor–Controlled Entities obtained money from Chrysalis. Indeed, as discussed in more detail below, the Debtor himself effectively obtained these monies from Chrysalis, as he made sure that a substantial portion of these funds were deposited into the account of ComCon, who had obtained a $1.0 million loan that the Debtor had personally guaranteed; and by moving funds from Chrysalis's account into ComCon's account, the Debtor put Com-Con into a much better position to pay off the large debt that the Debtor had personally guaranteed. Additionally, he ensured that a significant amount of the proceeds went into the account of IIM—which was one of the few companies in which he held a 100% interest. [Findings of Fact Nos. 18 & 27(d) ].

Second, the Debtor committed actual fraud when he transferred the $1,161,279.90 from Chrysalis's account to the accounts of the Debtor–Controlled Entities. The badge of fraud analysis that this Court has already undertaken demonstrates that this is so. [See supra Part V.C.I.a.]. Indeed, the evidence reflects that the transfers of $1,161,279.90 from Chrysalis's account to the accounts of the Debtor–Controlled Entities all resulted from the Debtor's actions. He—and he alone—was responsible for effectuating these transfers. [Finding of Fact No. 26].

Third, a personal debt of the Debtor arose due to the Debtor–Controlled Entities obtaining funds from the Debtor's fraudulent conduct. This is so because of the veil-piercing statute of § 21.223(b). This statute imposes personal liability on the Debtor for the $163,999.38 Debt. [See supra Part V.C.2]. There is no question that the creation of this personal obligation is directly traceable to—i.e., resulted from—the Debtor's fraudulent actions in orchestrating the transfers of $1,161,279.90 out of Chrysalis's account and into the accounts of the Debtor–Controlled Entities. Husky Intl. Elecs., Inc., 136 S.Ct. at 1589 ("If that recipient [here, the Debtor] later files for bankruptcy, any debts 'traceable to' the fraudulent conveyance, will be nondischargeable under § 523(a)(2)(A).").

The fact that the creation of the $163,999.38 Debt itself—i.e., the obligation owed by Chrysalis to Husky—was not due to any fraud (but rather due to the fact that Chrysalis failed to pay the obligations that it owed to Husky under the Master Credit and Sales Agreement) does not change this conclusion. Moreover, the fact that Chrysalis—or, more precisely, the trustee of Chrysalis's Chapter 7 estate—may have a non-dischargeable claim against the Debtor in the amount of $1,161,279.90 also does not change this conclusion.[27] The personal debt that Husky

---

27. The Debtor orchestrated transfers of $1,161,279.90 out of Chrysalis's account, and Chrysalis received no consideration in exchange for these transfers. [Findings of Fact Nos. 15–21]. And, when the Debtor signed Chrysalis's SOFA, there was no disclosure made of these transfers, which were clearly not in the ordinary course of Chrysalis's business. [Finding of Fact No. 4]. Further, when the Debtor signed Chrysalis's schedules, there was no disclosure in item 21 of any claim that Chrysalis might have against the Debtor for

seeks to collect from the Debtor, and to prevent him from discharging, arises by operation of Texas law from his actual fraud; and to characterize this debt as non-dischargeable is entirely consistent with the Supreme Court's holding in *Archer v. Warner,* that "all debts arising out of fraud are excepted from discharge *no matter what their form,"* 538 U.S. 314, 321, 123 S.Ct. 1462, 155 L.Ed.2d 454 (2003) (internal quotations omitted) (emphasis added), as "it is unlikely that Congress ... would have favored the interest in giving perpetrators of fraud a fresh start," *Cohen,* 523 U.S. at 223, 118 S.Ct. 1212 (internal quotations omitted).

There is one final point: for the Debtor's personal liability on the $163,999.38 Debt to be non-dischargeable under § 523(a)(2)(A), does the Debtor himself have to have personally received the cash of $1,161,279.90 that he transferred out of Chrysalis's account—or is it sufficient to show that it was the Debtor himself who committed the fraud regardless of who actually received the money?

The Supreme Court has not expressly ruled on this issue. Several bankruptcy courts have, however, articulated three views as to whether a debtor must *personally* receive the money before allowing the

exception to discharge under § 523(a)(2)(A). *See, e.g., In re Wade,* 43 B.R. 976, 980–81 (Bankr. D. Colo. 1984); *In re Mones,* 169 B.R. 246, 251 (Bankr. D.D.C. 1994). The court in *Mones* succinctly described these views:

> The first view, which is that set forth by the defendant, requires that the debtor personally receive the money that he obtained by fraud. The second approach, characterized as the "receipt of benefits theory," requires only that the debtor derive a benefit from the money that the debtor obtained by fraud; whom the money was obtained for is irrelevant. Finally, the third approach holds that the exception applies whenever the debtor fraudulently obtains money, irrespective of whether it is for himself and whether the debtor received any benefit.

*In re Mones,* 169 B.R. at 251.

There are no circuit courts that have adopted the first view. *See, e.g., In re Brady,* 101 F.3d 1165, 1172 (6th Cir. 1996) ("We therefore reject debtor's implication that a debt is non-dischargeable under section 523(a)(2)(A) only when the creditor proves that the debtor directly and personally received every dollar lost by the creditor.").[28] Rather, those circuit courts that

---

orchestrating the transfer of $1,161,279.90 to the accounts of the Debtor–Controlled Entities. [*Id.*]. As noted in *supra* note 21, these circumstances may provide a basis for the Chapter 7 trustee in the Chrysalis case to file suit against the Debtor under an alter ego/fraudulent conveyance theory seeking a judgment for the amount of $1,161,279.90, and further seeking a judgment declaring that this amount is non-dischargeable under § 523(a)(2)(A). The major difference between Husky's claim here and the trustee's putative claim in Chrysalis's case is that the non-dischargeable obligation here is only $163,999.38 and it benefits solely Husky; whereas, the non-dischargeable obligation possibly to be sought by the trustee in the Chrysalis case would be $1,161,279.90, and

recovery of this amount would benefit all of Chrysalis's creditors, not just Husky.

**28.** A cursory review of the Fourth Circuit's decision in *In re Rountree,* 478 F.3d 215 (4th Cir. 2007) might lead one to conclude that the Fourth Circuit has adopted the first view. Indeed, at the end of the opinion, the Fourth Circuit states that "[b]oth the plain language of the statute and the Supreme Court's interpretation of that language lead us to require for exception to discharge that the debtor have fraudulently obtained money, property, services, or credit." *Id.* at 222. However, a careful reading of this opinion indicates that the debtor in that case received nothing through her fraud. Indeed, the Fourth Circuit, in responding to one of the creditor's arguments, stated that: "The key in *Cohen* is that

have faced this issue have either adopted the second view or the third view. The Eleventh Circuit and the Ninth Circuit have expressly adopted the second view. *In re Bilzerian*, 100 F.3d 886, 890 (11th Cir. 1996) ("We agree with our sister circuits that the 'receipt of benefits' theory is the more well-reasoned approach."); *In re Arm*, 87 F.3d 1046, 1049 (9th Cir. 1996) ("We make clear, what we have not held before, that the indirect benefit to the debtor from a fraud in which he participates is sufficient to prevent the debtor from receiving the benefits that the bankruptcy law accords the honest person."). The Fifth Circuit has adopted the third view. *In re M.M. Winkler & Assocs.*, 239 F.3d 746, 749 (5th Cir. 2001) ("The language of [§ 523(a)(2)(A) ] includes no 'receipt of benefit' requirement."); *In re Pryor*, 992 F.2d 324, 324 n.4 (5th Cir. 1993) ("... [I]t is not necessary under section 523(a)(2) that the property be actually procured by the debtor.") (citing *In re Gitelman*, 74 B.R. 492, 496 (Bankr. S.D. Fla. 1987)) (unpublished). The Eleventh Circuit has aptly stated that the third view takes the broadest perspective because it "requires simply that a debtor obtain money by fraudulent means such that a debtor does not necessarily have to receive money personally or receive any benefit at all." *In re Bilzerian*, 100 F.3d at 890.

This Court is bound by Fifth Circuit precedent, and therefore does not need to make a finding that the Debtor directly received the $1,161,279.90 that he transferred out of Chrysalis's account; or, alternatively, make a finding that he indirectly benefitted from his transferring these mo-

nies out of Chrysalis's account. Rather, this Court need only make a finding the $1,161,279.90 transferred from Chrysalis's account to the accounts of the Debtor–Controlled Entities was done fraudulently by the Debtor—and this, the Court has already done.

Assuming, however, that this Court did have to make a finding that the Debtor benefitted from these transfers, the record demonstrates that he definitely did so.[29] Here, the Debtor himself admitted under oath that he received a personal benefit from the transfers that he orchestrated from Chrysalis's account to the accounts of the Debtor–Controlled Entities. [Finding of Fact No. 24]. Moreover, once the funds were transferred, the Debtor put himself in a much better position, as ComCon had much more cash to pay off the $1.0 million loan that the Debtor had personally guaranteed; and, further, he also benefitted, either directly or indirectly, through his tunneling of approximately $172,100.00 into the account of Institutional Insurance Management, one of the companies in which he holds a 100% interest. [Findings of Fact Nos. 18 & 27(d) ].

In sum, the Debtor's testimony that he received a personal benefit from the transfers of the $1,161,279.90 to the Debtor–Controlled Entities, combined with the stark fact that he had guaranteed a $1.0 million loan of ComCon and owned 100% of Institutional Insurance Management, is more than sufficient for this Court to hold that the Debtor was the recipient, either directly or indirectly, of the funds that he transferred out of Chrysalis's account.

the debtor obtained something through his fraud." *Id.* Thus, it appears that the Fourth Circuit, although it did not expressly so state, would adopt the second view—namely, that so long as the debtor received some benefit from his or her fraud, a judgment of non-dischargeability is required.

**29.** Even if no Fifth Circuit precedent existed, leaving this Court to decide whether to adopt the first view or the second view, this Court would reject the first view and adopt the second view.

Thus, the circumstances here fit within the fact pattern that the Supreme Court in *Ritz* described as follows:

It is of course true that the transferor does not 'obtai[n]' debts in a fraudulent conveyance. But the recipient of the transfer—who, with the requisite intent, also commits fraud—can obtain assets by his or her participation in the fraud. If that recipient later files for bankruptcy, any debts 'traceable to' the fraudulent conveyance, will be nondischargeable under § 523(a)(2)(A). Thus, at least "sometimes a debt 'obtained by' a fraudulent conveyance scheme could be nondischargeable under § 523(a)(2)(A). Such circumstances may be rare because a person who receives fraudulent conveyed assets is not necessarily (or even likely to be) a debtor on the verge of bankruptcy, but they make clear that fraudulent conveyances are not wholly incompatible with the 'obtained by' requirement.

*Husky Int'l Elecs., Inc.*, 136 S.Ct. at 1589 (internal citations and quotations omitted).

Rare though these circumstances may be, they do exist here; and, therefore, this Court concludes that the Debtor's personal obligation to Husky in the amount of $163,999.38 is a non-dischargeable debt under § 523(a)(2)(A).

The question now is whether the total amount of the non-dischargeable obligation that the Debtor owes to Husky is simply $163,999.38—or an amount that is higher. The Court now addresses this issue.

### 4. Relief to be Awarded to Husky

#### a. Introduction

In the Complaint, Husky prayed for the following relief:

(i) Actual damages; (ii) Avoidance of all fraudulent transfers to the extent necessary to satisfy [Husky's] claims; (iii) Exemplary damages; (iv) Prejudgment and post judgment interest at the maximum lawful rate; (v) Attorneys' fees; (vi) Court costs; and (vii) All other relief to which [Husky] shall show itself to be justly entitled; together with a determination that the judgment entered may not be discharged by Defendant's bankruptcy pursuant to 11 U.S.C. § 523(a). [Adv. Doc. No. 1, p. 10, ¶ 26].

This Court will not grant the second category of relief sought by Husky because Husky did not plead for this relief in the Pre–Trial Statement; it did not reference § 550 in the Pre–Trial Statement; nor did it sue the Debtor–Controlled Entities (i.e., the recipients of the fraudulently transferred funds). *See e.g., In re Hansen*, 341 B.R. 638 (Bankr. N.D. Ill 2006); *In re Pace*, 456 B.R. 253 (Bankr. W.D. Tex. 2011); *In re Lacina*, 451 B.R. 485 (Bankr. D. Minn. 2011) (all cases where the defendants named were the individual recipients and their corporate egos). Nor will this Court award exemplary damages or costs because Husky did not plead for these two types of relief in the Joint Pretrial Statement. *See Prise v. Alderwoods Grp., Inc.*, No. 06-1470, 2011 WL 2532870, at *8 (W.D. Pa. 2011); *see also Winmar, Inc. v. Al Jazeera Int'l*, 741 F.Supp.2d 165, 185 (D.D.C. 2010) ("A party's failure to advance a theory of recovery in a pretrial statement issued following discovery conference constitutes a waiver of that theory."). Indeed, Husky did not request this relief in its post-remand oral argument or briefs.

With respect to the remaining categories of specific relief requested by Husky, the Court grants this relief as discussed in greater detail below.

#### b. The Components of the Judgment to be Awarded to Husky

█ In *In re Morrison*, 555 F.3d 473 (5th Cir. 2009), the Fifth Circuit held that

a bankruptcy court has "jurisdiction to enter judgment against [a debtor] for the debt owed to [a plaintiff] after it found the debt nondischargeable." *Id.* at 479–80. In the suit at bar, this Court has concluded that the personal obligation that the Debtor owes to Husky is a non-dischargeable debt. Now, this Court will determine the exact amount of this non-dischargeable obligation and enter judgment for this amount. To do so it is necessary to add up the following categories after determining the specific amount for each respective category: (1) actual damages; (2) pre-judgment on the amount of actual damages; and (3) reasonable attorneys' fees. Once this specific amount is determined, it will then bear post-judgment interest, and the post-judgment interest will also be a non-dischargeable obligation. All of these components are non-dischargeable based upon the Supreme Court's holding in *Cohen* that the determination of non-dischargeability for "any debt . . . for money . . . to the extent obtained by fraud encompasses *any liability* arising from money . . ., that is fraudulently obtained, *including . . . attorney's fees, and other relief that may exceed the value obtained by the debtor.*" *Cohen,* 523 U.S. at 223, 118 S.Ct. 1212 (emphasis added).

**1) Actual Damages Incurred by Husky**

In its remand opinion, the Fifth Circuit issued the following holding: "If the bankruptcy court concludes on remand that Ritz's conduct satisfies the actual fraud prong of TUFTA and that the actual fraud was for Ritz's 'direct personal benefit,' Tex. Bus. Orgs. Code Ann. 21.223(b), then Ritz is liable for Chrysalis's debt to Husky under Texas's veil-piercing statute . . . ." *Matter of Ritz,* 832 F.3d at 569. This Court, on remand, has in fact concluded that the Debtor's conduct falls within § 21.223(b); therefore, pursuant to the Fifth Circuit's holding, this Court finds

that the Debtor is personally liable for Chrysalis's debt to Husky—i.e., he is liable for the $163,999.38 Debt. The figure of $163,999.38 is the measure of Husky's actual damages, as this amount represents the sum of the invoices that Husky sent to Chrysalis but which Chrysalis failed to pay. [Finding of Fact No. 7]; *see also Nwokedi,* 428 S.W.3d at 203 ("The creditor may also recover a judgment for the value of the asset transferred or in the amount necessary to satisfy the creditors claim, whichever is less."). This failure to pay would not have occurred but for the Debtor's draining of Chrysalis's cash by orchestrating transfers of $1,161,279.90 into the accounts of the Debtor–Controlled Entities. [Finding of Fact No. 23]. *McCarthy,* 251 S.W.3d at 593 ("The test for cause in fact is whether an 'act or omission was a substantial factor in bringing about injury,' without which the harm would not have occurred.") (quoting *Doe v. Boys Clubs of Greater Dallas, Inc.,* 907 S.W.2d 472, 477 (Tex. 1995)).

In its remand opinion, the Fifth Circuit also stated that if this Court concluded that the Debtor is personally liable for the $163,999.38 Debt under § 21.223(b), then this Court must address whether the Debtor's obligation is non-dischargeable under § 523(a)(2)(A). *Matter of Ritz,* 832 F.3d at 569. This Court has now concluded, as already discussed herein, that the Debtor's personal liability for the $163,999.38 Debt is non-dischargeable.

Thus, this Court grants Husky's request for actual damages, with the specific amount being $163,999.38; and, moreover, this Court grants Husky's request that the Debtor's obligation for this amount be declared as non-dischargeable.

**2) Pre- and Post–Judgment Interest**

i. Pre–Judgment Interest

This Court has discretion to impose pre-judgment interest. *See Williams*

*v. Trader Pub. Co.*, 218 F.3d 481, 488 (5th Cir. 2000). However, in exercising its discretion on this issue, the Fifth Circuit has held as follows:

> The determination for whether prejudgment interest should be awarded requires a two-step analysis: does the federal act creating the cause of action preclude an award of prejudgment interest, and if not, does an award of prejudgment interest further the congressional policies of the federal act. If prejudgment interest can be awarded under the two-prong test, whether such interest is awarded in any given case is within the court's discretion.

*Carpenters Dist. Council of New Orleans & Vicinity v. Dillard Dept. Stores, Inc.*, 15 F.3d 1275, 1288 (5th Cir. 1994) (internal citations omitted).

 In the suit at bar, there is no provision of the Bankruptcy Code in general, or § 523 in particular, precluding an award of pre-judgment interest. Moreover, the Fifth Circuit has held that pre-judgment interest may be awarded in cases involving fraudulent transfers because it "furthers the congressional policies of the Bankruptcy Code" and "compensates the estate for the time it was without use of the transferred funds." *In re Tex. Gen. Petroleum Corp.*, 52 F.3d 1330, 1339–40 (5th Cir. 1995); *see In re Kovler*, 253 B.R. 592, 602–03 (Bankr. S.D.N.Y. 2000) (awarding pre-judgment interest to creditor who was successful in fraudulent conveyance adversary proceeding). Granted, *Texas General* involved a bankruptcy trustee recovering fraudulent transfers for the estate; whereas, in the suit at bar, the plaintiff is not a trustee, but rather an individual creditor recovering a judgment solely for itself. Nevertheless, this is a watershed case that has led the Supreme Court to hold that a § 523(a)(2)(A) action can be successful based upon fraudulent

transfers; and here, Husky has in fact prevailed by showing that the Debtor orchestrated fraudulent transfers. Moreover, the Supreme Court has held that § 523(a)(2)(A) should not be construed in favor of "giving perpetrators of fraud a fresh start over the interest in protecting victims of fraud." *Cohen*, 523 U.S. at 223, 118 S.Ct. 1212 (internal citation and quotation omitted). Here, to allow the Debtor to escape paying pre-judgment interest would be to "allow the malefic debtor [to] hoist the Bankruptcy Code as protection from the full consequences of fraudulent conduct." *In re Bilzerian*, 100 F.3d at 891 (internal quotation and citation omitted).

Awarding pre-judgment interest also furthers the congressional purpose that the Code provide a discharge to only honest debtors. *Grogan*, 498 U.S. at 286–87, 111 S.Ct. 654; *White v. Brown Shoe Co.*, 30 F.2d 674, 674–75 (5th Cir. 1929); *In re Gartner*, 326 B.R. 357, 378 (Bankr. S.D. Tex. 2005). Here, the Debtor, who was not a credible witness, who made material misrepresentations in Chrysalis's SOFA, and who committed actual fraud, but who nevertheless received a discharge from all his debts in his main Chapter 7 case (except the personal obligation to Husky and the possible obligation to the Chapter 7 trustee in the Chrysalis case), [Findings of Fact Nos. 4, 13, & 26], should not be allowed to walk away with only having to pay the amount of $163,999.38. Indeed, "[t]he purpose of prejudgment interest is to 'make a plaintiff whole' . . ., not reward or punish a party for its litigation conduct." *Tow*, 2015 WL 1058080, at *14 (quoting *Williams*, 218 F.3d at 488). It would be grossly inequitable for the Debtor to escape without having to pay the time-value of money.

Therefore, for all the reasons set forth above, this Court, exercising its discretion,

awards pre-judgment interest to Husky. The next question is at what rate?

■ Because no federal statute sets the pre-judgment interest rate, the Court must look to state law. *ASARCO LLC v. Americas Mining Corp.*, 404 B.R. 150, 164 (S.D. Tex. 2009) (holding that for "fraudulent-transfer actions ... courts may look to the laws of the state under which a similar fraudulent-transfer action could have been brought for such guidance"); *see also In re Zohdi*, 234 B.R. 371, 385 (Bankr. M.D. La. 1999) (holding that the court should look to state law for the pre-judgment interest rate). Under Texas law, the rate of pre-judgment interest "accrue[s] at the same rate as postjudgment interest." *Int'l Turbine Servs., Inc. v. VASP Brazilian Airlines*, 278 F.3d 494, 500 (5th Cir. 2002); *see also Bob Anderson v. Mega Lift Sys., L.L.C. (In re Mega Sys., L.L.C.)*, No. 04-6085, 2007 WL 1643182, at *10–11 (Bankr. E.D. Tex. 2007). The postjudgment rate is statutorily set at the "prime rate as published by the Board of Governors of the Federal Reserve System on the date of computation." The current prime rate is 4.0%. *Selected Interest Rates (Daily)—H.15*, BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYS. (April 14, 2017), https://www.federalreserve.gov/releases/h 15/. Section 304.003(c)(2) of the Texas Finance Code Annotated states that the judgment rate shall be set at 5.0% if the current prime rate is less than 5.0%. Therefore, pursuant to § 304.003(c)(2) of the Texas Finance Code Annotated, the Court will award Husky pre-judgment interest at a rate of 5% per annum. *See Int'l Turbine Servs., Inc.*, 278 F.3d at 500 (holding that the rate of pre-judgment interest accrues at the same rate as post-judgment interest); *see also In re Mega Sys., L.L.C.*, 2007 WL 1643182, at *10–11 (holding same).

■ An award of pre-judgment interest will accrue from the "time demand is made or an adversary proceeding is instituted." *Floyd v. Dunson (In re Rodriguez)*, 209 B.R. 424, 434 (Bankr. S.D. Tex. 1997). Therefore, here, the Court finds that the pre-judgment interest rate of 5.0% accrues as of the date of Husky's initiation of the Adversary Proceeding— i.e., March 31, 2010, [Finding of Fact No. 31]. Thus, the amount of this pre-judgment interest is $57,766.62.[30] Further, the Court

---

**30.** The calculation is done for the period of March 31, 2010 through April 18, 2017 (i.e., up to the date that this Memorandum Opinion is entered on the docket). The calculation is done using 5% simple interest. *Arete Partners, L.P. v. Gunnerman*, 643 F.3d 410, 415 (5th Cir. 2011) (citing *Johnson & Higgins on Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 532 (Tex. 1998)); *Huggins v. Royalty Clearinghouse, Ltd.*, 121 F.Supp.3d 646, 660 (W.D.

concludes that all pre-judgment interest is non-dischargeable; the Court does so based upon the Supreme Court's language in *Cohen* that the non-dischargeable debt includes "other relief." *Cohen,* 523 U.S. at 223, 118 S.Ct. 1212; *In re Ayesh,* 465 B.R. 443, 449–50 (Bankr. S.D. Tex. 2011) (applying *Cohen* to find legal fees, interest, and other costs from the breach of contract to be non-dischargeable); *Miller v. Lewis,* 391 B.R. 380, 385 (E.D. Tex. 2008) (applying *Cohen* and find that the entirety of a judgment was an "obvious outgrowth" of the "fraudulent scheme"). The sum of $163,999.38 plus $57,766.62 equals $221,766.00, and this amount will bear postjudgment interest, as discussed below.

### ii. Post–Judgment Interest

28 U.S.C. § 1961(a) sets forth that interests "shall be allowed on any money judgment in a civil case recovered in a district court." This statute also "applies to judgments entered by a bankruptcy court." *Ocasek v. Manville Corp. Asbestos Disease Comp. Fund,* 956 F.2d 152, 154 (7th Cir. 1992). Further, the statute sets forth that the interest will be at the rate of the "weekly average 1–year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment." 28 U.S.C. § 1961(a). For the week of April 17 to April 23, 2017, the post-judgment interest rate for federal judgments is 1.05% per annum. United States District & Bankruptcy Court Southern District of Texas, POST-JUDGMENT INTEREST RATES, http://www.txs.uscourts.gov/page/post-judgment-interest-rates (last accessed April 19, 2017). Accordingly, the Court will grant Husky's request for post-judgment interest and will impose a rate of 1.03% per annum. *In re Beveridge,* 416 B.R. 552, 581–82 (Bankr. N.D. Tex. 2009); *In re Haler,* Adv. No. 10-4217, 2016 WL 825668, at *14–15 (Bankr. E.D. Tex. Mar. 2, 2016); *In re Mascio,* No. 03-1482 MER, 2014 WL 2621201, at *9 (Bankr. D. Colo. June 12, 2014) (all courts awarding post-judgment interest on debts that were declared non-dischargeable pursuant to § 523(a)(2)(A)).

This Court's award of post-judgment interest will accrue during the period from the date the judgment is rendered until the date the judgment is satisfied. *La. Power & Light Co. v. Kellstrom,* 50 F.3d 319, 331–32 (5th Cir. 1995). Further, the Court concludes that all post-judgment interest is non-dischargeable, once again relying upon the language in *Cohen* that the

Tex. 2015). This calculation is shown on the following chart:

| Simple Interest Calculation from March 31, 2010 through April 18, 2017 | |
| --- | --- |
| Amount (principal) | $163,999.38 |
| Interest Rate | 5.00% |
| Term (years) | 7 |
| Interest | $57,339.78 |
| | |
| Amount (principal) | $163,999.38 |
| Interest Rate | 5.00% |
| Term (days) | 19 |
| Interest | $426.84 |
| | |
| Total Interest | $57,766.62 |
| Interest + Principal | $221,766.00 |

non-dischargeable debt includes "other relief." *Cohen*, 523 U.S. at 223, 118 S.Ct. 1212; *Ayesh*, 465 B.R. at 449–50; *Miller*, 391 B.R. at 385.

### 3) Reasonable Attorneys' Fees

With respect to Husky's request for attorneys' fees, the holding in *Cohen* is that a non-dischargeable debt in a § 523(a)(2)(A) encompasses not only the debt created by the fraud, but also an award of attorneys' fees, among other damages. Stated differently, the word "debt" in § 523(a)(2)(A) encompasses any form of damage that can be causally linked to the conduct that gives rise to the non-dischargeable debt. *Cohen*, 523 U.S. at 220, 118 S.Ct. 1212; *In re Whittington*, 530 B.R. 360, 386–88 (Bankr. W.D. Tex. 2014). Here, the Court concludes that the attorneys' fees incurred by Husky for the prosecution of the Adversary Proceeding are directly linked to the Debtor's conduct that gave rise to the non-dischargeable obligation owed by the Debtor to Husky. *Husky Int'l Elecs., Inc.*, 136 S.Ct. at 1589 (holding that "any debts 'traceable to' the fraudulent conveyance ... will be nondischargeable under § .523(a)(2)(A)"). The link is this: but for the Debtor's fraudulent transfer of the $1,161,279.90 from Chrysalis's account to the accounts of the Debtor–Controlled Entities, there could be no non-dischargeable obligation owed by the Debtor to Husky.

 Of course, under the so-called "American Rule," each party pays its own attorneys' fees arising out of litigation except when specific authority granted by statute or contract states otherwise. "Since the Bankruptcy Code does not address whether creditors can recover attorney's fees in non-dischargeability cases, they can do so if allowed by another statute or by

contract." *In re Kirk*, 525 B.R. 325, 330 (Bankr. W.D. Tex. 2015) (footnote omitted). Indeed, the Fifth Circuit has held that creditors can recover attorneys' fees only if there is a contractual or statutory right to fees under state law. *Jordan*, 927 F.2d at 226–27; *In re Luce*, 960 F.2d 1277, 1285–86 (5th Cir. 1992).

 The Court finds that there is a contractual basis for awarding attorneys' fees to Husky. Paragraph 13 of the Master Credit and Sales Agreement reads as follows: "If Seller [i.e., Husky] engages legal counsel to enforce Seller's rights under this Master Credit and Sales Agreement, Buyer [i.e., Chrysalis] shall pay Seller's reasonable attorneys [sic] fees and costs incurred by Seller in connection with such efforts, whether or not litigation is commenced." [Finding of Fact No. 6]. While the Master Credit and Sales Agreement is between Husky and Chrysalis, this Court nevertheless concludes that because Husky has pierced the corporate veil to impose the $163,999.38 Debt on the Debtor personally, the Debtor is also liable for the attorneys' fees incurred by Husky in prosecuting the Adversary Proceeding. *See Wachovia Secs., LLC v. Jahelka*, 586 F.Supp.2d 972, 1014 (N.D. Ill. 2008), *aff'd in part and vacated in part by Wachovia Secs., LLC v. Banco Panamericano, Inc.*, 674 F.3d 743 (7th Cir. 2012) (piercing the defendant's corporate veil to hold the individual defendants liable for the judgment, including the contractually obligated attorneys' fees); *Menetti v. Chavers*, 974 S.W.2d 168, 171 n.5 (Tex. App.–San Antonio 1998, no pet.) ("If the corporate veil is pierced, the shareholders are considered the equivalent of the corporation .... The corporation's liability becomes the shareholder's liability absolutely.").[31]

---

**31.** In addressing this issue, the Fifth Circuit has found that it is inappropriate to uphold

an award of attorneys' fees when the corporate veil is not pierced or when the alter ego

The Court also finds that there is a statutory basis for awarding fees to Husky. Specifically, Husky had to successfully invoke § 24.005 of TUFTA to be able to pierce the corporate veil of Chrysalis under § 21.223(b). To do this, Husky had to allege and prove that several badges of fraud existed under § 24.005(b). Section 24.008(a)(3)(C) of TUFTA sets forth that "[i]n an action for relief against a transfer . . . under this chapter, a creditor . . . may obtain . . . any other relief the circumstances may require." And, § 24.013 of TUFTA sets forth that "[i]n any proceeding under this chapter, the court may award costs and reasonable attorney's fees as are equitable and just." Here, the Court finds that the suit at bar constitutes a "proceeding under this chapter" because it necessarily involves TUFTA: Husky had to prove up the badges of fraud as set forth in TUFTA in order to prove that the Debtor's orchestration of transfers of $1,161,279.90 constituted "actual fraud." *Matter of Ritz*, 832 F.3d at 568–69. Because this suit is a proceeding under TUFTA, this Court is authorized to award "any other relief the circumstances may require." And here, this Court finds that such circumstances include awarding Husky its reasonable attorneys' fees as allowed by § 24.013 of TUFTA. There is ample case law supporting such an award when the plaintiff has proven fraudulent transfers. *See e.g., Tow*, 2015 WL 1058080, at *16 ("TUFTA permits a court to award costs and reasonable attorney's fees as are equitable and just.") (internal citation and quotation omitted); *Walker v. Anderson*, 232 S.W.3d 899, 919–20 (Tex. App.–Dallas 2007, no pet.). Indeed, it would be inequitable to require Husky to prove actual fraud under TUFTA without compensation for

the arguments therein. Thus, the Court concludes that Husky is entitled to its reasonable attorneys' fees for prosecuting the Adversary Proceeding.

A key question is just exactly how much does prosecuting the Adversary Proceeding encompass? Does it mean that Husky should just recover its attorneys' fees for trying the Adversary Proceeding in this Court in 2011? Or, does it mean that Husky should recover its attorneys' fees for not only prosecuting the complaint at the trial in 2011, but also for prosecuting its appeals up to the Supreme Court and, additionally, for making post-remand arguments in this Court?

The term "adversary proceeding" is equivalent to the term "action": both refer to a lawsuit. The term "action" is ambiguous, as it does not articulate whether the "action" is the first lawsuit or if it includes appeals. In *Nigh v. Koons Buick Pontiac GMC, Inc.*, 478 F.3d 183 (4th Cir. 2007), the Fourth Circuit determined that "*action* encompasses each stage of [the plaintiff's] litigation, including the Supreme Court appeal and all the proceedings that followed." *Id.* at 185 (emphasis in original). Further, the Fourth Circuit found that "[a]n action constitutes more than an individual appearance before one particular tribunal. In ordinary usage, an action—a civil action, at least—begins with the filing of a complaint and ends when no party may any longer obtain review of the final disposition of the case, encompassing all steps necessary in between." *Id.* at 186. Thus, the *Nigh* court determined that:

> [D]efining *action* in this way means it is possible for a . . . plaintiff to obtain attorney's fees for a state of litigation at

theory fails. *See e.g., Fidelity & Deposit Co. of Md. v. Commercial Cas. Consultants*, 976 F.2d 272, 277 (5th Cir. 1992); *Gibraltar Savings v. LDBrinkman Corp.*, 860 F.2d 1275, 1295 (5th

Cir. 1988). Thus, inferentially, if there is a successful piercing of the corporate veil to find personal liability of the debtor, then the attorneys' fee award would likewise stand.

which she does not prevail. If a plaintiff does not prevail before the district court, but later is determined to have successfully demonstrated a defendant's liability, her actions are successful, and she may recover fees for work done at trial level.

*Id.* While the *Nigh* court made this analysis using TILA (Truth in Lending Act), this Court sees no reason why this same logic would not equally apply to the suit at bar.

■■ Here, the Court finds that Husky has prevailed in proving that the Debtor committed actual fraud primarily for his personal benefit. Proving this was no simple task—Husky fervently argued its case all the way up to the Supreme Court and then continued making post-remand arguments in this Court. Similar to the plaintiff in *Nigh*, Husky should be compensated for this work. *See, e.g., Coston v. Plitt Theaters, Inc.*, 727 F.Supp. 385, 390 (N.D. Ill. 1989) (finding that "because [the plaintiff] has ultimately won the war, we will award him the cost of defending ... even though he lost some skirmishes along the way"); *Snider v. Am. Family Mut. Ins. Co.*, 297 Kan. 157, 175, 298 P.3d 1120 (2013) (excluding fees for litigation when the applicant did not prevail). Here, Husky, while having "lost some skirmishes along the way," was successful before the Supreme Court and is now successful in this Court on remand; therefore, reasonable attorneys' fees for all of Husky's efforts are warranted.

■■ Further, this Court has the authority to determine what amount of fees are reasonable. Rule 7054(b)(2); *Perkins v. Standard Oil Co.*, 399 U.S. 222, 223, 90 S.Ct. 1989, 26 L.Ed.2d 534 (1970) (per curiam) (mandating the district court to determine reasonable attorneys' fees for litigation, including various appeals); *see also Dague v. City of Burlington*, 976 F.2d

801, 804 (2d Cir. 1991) (holding that "determination of a reasonable attorney's fee ... should normally be decided by the district court in the first instance"). Indeed, this Court, rather than an appellate court, is best situated to review and analyze the evidence presented on a fee application. *In re ASARCO, L.L.C.*, 751 F.3d 291, 294 (5th Cir. 2014) ("A bankruptcy court has 'broad discretion' to determine reasonable attorneys' fees, as the 'bankruptcy court is more familiar with the actual services performed and has far better means of knowing what is just and reasonable than an appellate court can have.'") (quoting *In re Lawler*, 807 F.2d 1207, 1211 (5th Cir. 1987)); *Dague*, 976 F.2d at 804. The evidence presented to prove reasonable attorneys' fees "may include voluminous and detailed records of attorney and staff hours spent on various projects, affidavits regarding reasonable billing rates in the relevant communities at various times during the pendency of the suit, as well as data and argument concerning whether, under the overall circumstances of the case, a claimed fee is reasonable." *Dague*, 976 F.2d at 804; *see also Citizens Against Rent Control v. City of Berkeley, Cali.*, 181 Cal.App.3d 213, 277, 226 Cal.Rptr. 265 (1986) (upholding fees for arguments in state court, appeals, and before the Supreme Court when there were detailed summaries of time expended for staff). This Court, in due course, will make a determination on the exact amount of attorneys' fees to be awarded to Husky.

Additionally, the Court will also order the Debtor to pay Husky post-judgment interest on the total amount of attorneys' fees ultimately awarded. The Fifth Circuit has held that interest on attorneys' fees begins to accrue on the date of the judgment allowing recovery of attorneys' fees and runs until the date the fees are paid in full. *See Copper Liquor, Inc. v. Adolph*

*Coors Co.*, 701 F.2d 542, 544–45 (5th Cir. 1983) (en banc), *overruled in part on other grounds by J.T. Gibbons, Inc. v. Crawford Fitting Co.*, 790 F.2d 1193, 1195 (5th Cir. 1986), *aff'd* 482 U.S. 437, 107 S.Ct. 2494, 96 L.Ed.2d 385 (1987) (holding that the prevailing party is entitled to interest on attorneys' fees, at the same interest rate as that applied to the judgment on the merits). The Fifth Circuit allows this interest on attorneys' fees because it "better serve[s] the purpose of awarding these expenses to the prevailing party since it … more nearly compensate[s] the victor for the expenses of the litigation." *Id.* at 544. Further, just as the post-judgment interest that will accrue on the principal amount of $163,999.38 plus the pre-judgment interest amount of $57,766.62 is non-dischargeable, the post-judgment interest that accrues on the attorneys' fees is also a non-dischargeable obligation. Once again, in making this conclusion, the Court relies upon the language in *Cohen* that the non-dischargeable debt imposed upon the Debtor includes "other relief." *Cohen*, 523 U.S. at 223, 118 S.Ct. 1212; *Ayesh*, 465 B.R. at 449–50 (finding legal fees to be nondischargeable); *In re Lutgen*, No. 98-CV-0764E(SC), 1999 WL 222605, at *3 (W.D.N.Y. Apr. 5, 1999) (same).

## VI. CONCLUSION

During trial, the Debtor once stated that "you begin your entrepreneurial career with your dreams in full bloom and your integrity intact. Be sure that you finish you career with your dreams realized and your integrity still intact." [Feb. 2, 2011 Tr. 73:22–74:4]. The Debtor further testified that he still lived his professional business life by this motto. [*Id.* at 74:7–8]. The Debtor's actions here are wholly inconsistent with his highly cherished "integrity"—indeed, he will be finishing this part of his life with little integrity at all.

The Debtor lost his integrity when he utilized Chrysalis as an entity to funnel money away from its creditors, such as Husky. He will now bear the consequences of his actions. Because the Debtor committed actual fraud for his personal benefit when he made the transfers of $1,161,279.90 from Chrysalis to the Debtor–Controlled Entities, the Debtor became personally liable to Husky by virtue of the Texas veil-piercing statute, i.e., § 21.223(b). And, because the Debtor's personal obligation to Husky is non-dischargeable under § 523(a)(2)(A), he is now liable for the following non-dischargeable amounts: (1) $163,999.38; (2) pre-judgment interest on the $163,999.38 Debt, which totals $57,766.62; (3) post-judgment interest of 1.05% per annum on the amount of $221,766.00 (representing the sum of $163,999.38 plus the pre-judgment interest amount of $57,766.62); (4) reasonable attorneys' fees incurred by Husky (with the specific amount to be subsequently determined); and (5) post-judgment interest of 1.05% per annum on the amount of the reasonable attorneys' fees incurred by Husky.

A judgment consistent with this Memorandum Opinion will be entered on the docket as soon as this Court makes a determination regarding the amount of reasonable attorneys' fees to be awarded to Husky.